McDOUGALL v SCHANZ

SOBRAN v McKENDRICK

Docket Nos. 107956, 110707. Argued May 5, 1999 (Calendar Nos. 1-2).
    Decided July 30, 1999.

Edward McDougall, as personal representative of the estate of Sandra
    M. McDougall, deceased, brought a medical malpractice action in
    the Wayne Circuit Court against Larry K. Schanz, D.O., Reuben D.
    Eliuk, D.O., the Garden City Osteopathic Hospital, and other physi-
    cians, for the wrongful death of his wife, Sandra. The trial court,
    Paul S. Teranes, J., excluded testimony of the plaintiff's expert
    regarding standard of care on the ground that the witness was
    unqualified under MCL 600.2169; MSA 27A.2169, but rejected the
    plaintiff's argument that the statute is unconstitutional, concluding
    instead that § 2169 and MRE 702, governing the admission of
    expert testimony, are complementary. The Court of Appeals,
    FITZGERALD, J., and P. D. HOUK, J. (TAYLOR, P.J., dissenting), affirmed
    in part and reversed in part, finding that § 2169 conflicts with MRE
    702, and that the statute is an unconstitutional violation of the
    Supreme Court's rule-making authority. 218 Mich App 501 (1996)
    (Docket No. 178042). Dr. Eliuk appeals.

John R. and Carole S. Sobran brought a medical malpractice action in
    the Oakland Circuit Court against Alasdair McKendrick, M.D. The
    trial court, Robert C. Anderson, J., excluded testimony of the plain-
    tiffs' expert on the basis of MCL 600.2169; MSA 27A.2169 and dis-
    missed the plaintiffs' claim with prejudice. The Court of Appeals,
    JANSEN, P.J., and SAAD and M. D. SCHWARTZ, JJ., while acknowledging
    that § 2169 had been declared unconstitutional by the Court of
    Appeals panel in *McDougall*, and that the trial court's ruling was
    based upon the statute, nevertheless affirmed the trial court's rul-
    ing in an unpublished opinion per curiam on the ground that the
    expert was not qualified under MRE 702, a ground that was neither
    argued before nor decided by the trial court (Docket No. 185581).
    The plaintiffs appeal.

In an opinion by Justice YOUNG, joined by Chief Justice WEAVER,
and Justices BRICKLEY and CORRIGAN, the Supreme Court *held*:

MCL 600.2169; MSA 27A.2169 is an enactment of substantive law that does not impermissibly infringe the Supreme Court's constitutional rule-making authority over practice and procedure.

1. It is beyond dispute that the Legislature envisioned and intended that MCL 600.2169; MSA 27A.2169 often will compel different qualification determinations than MRE 702 when applied to a given case. While MRE 702 authorizes expert testimony on the basis of knowledge, skill, experience, training, or education, § 2169 operates to preclude certain witnesses from testifying solely on the basis of their lack of practice or teaching experience in the relevant specialty. Anyone qualified by virtue of the MRE 702 criteria of skill, training, or education nonetheless could be excluded under the statute's strict practice or teaching requirements.

2. Under Const 1963, art 6, § 5, the Supreme Court's constitutional rule-making authority extends only to matters of practice and procedure, not to enactment of court rules that establish, abrogate, or modify the substantive law. A statutory rule of evidence violates Const 1963, art 6, § 5 only when no clear legislative policy reflecting considerations other than judicial dispatch of litigation can be identified. Therefore, if a particular court rule contravenes a legislatively declared principle of public policy, having as its basis something other than court administration, the court rule should yield. Section 2169 is an enactment of substantive law, reflecting wide-ranging and substantial policy considerations relating to medical malpractice actions against specialists, not the mere dispatch of judicial business.

*McDougall,* reversed.

*Sobran,* affirmed in part.

Justice TAYLOR joined Justice YOUNG in *Sobran* only, and took no part in the decision in *McDougall.*

Justice CAVANAGH, joined by Justice KELLY, dissenting, stated that MCL 600.2169; MSA 27A.2169 is an impermissible legislative usurpation of the judiciary's authority and, thus, is unconstitutional.

The authority to determine rules of procedure in judicial matters rests exclusively with the judiciary and the Supreme Court. The Legislature enacted MCL 600.2169; MSA 27A.2169, fully mindful and very much intending that it would often compel different conclusions than the court rule when applied to factual situations. It was well aware of MRE 702 and endeavored to craft a rule that would serve as a higher bar to be cleared before an expert's testimony would be admitted.

When confronted with a conflict between a court rule and a statute, the rule, properly enacted within its own domain, must prevail. The drafters of the Michigan Constitution squarely considered

whether the Legislature should be allowed to intrude upon the Supreme Court's power to determine rules of evidence, and the constitution that resulted from their efforts permits no such thing. It is clear that summary disposition was improperly granted in *McDougall*, requiring remand to the trial court for further proceedings. Likewise, in *Sobran*, the grant of summary disposition based on the statute cannot stand, requiring reversal and remand to the trial court for further proceedings.

*Granzotto & Nicita, P.C. (by Mark Granzotto), Justin C. Ravitz,* and *Lakin, Worsham & Victor, P.C. (by Sanford N. Lakin* and *Ron S. Kirsch),* for the plaintiff in *McDougall.*

*Granzotto & Nicita, P.C. (by Mark Granzotto),* for the plaintiffs-appellants in *Sobran.*

*O'Leary, O'Leary, Jacobs, Mattson, Perry & Mason, P.C. (by John P. Jacobs),* for defendant-appellant Reuben D. Eliuk, D.O.

*O'Leary, O'Leary, Jacobs, Mattson, Perry & Mason, P.C. (by John P. Jacobs* and *Kevin P. Hanbury),* for defendant-appellee Alastair McKendrick, M.D.

Amici Curiae:

*Dickinson, Wright, P.L.L.C. (by John E.S. Scott, Robert W. Powell* and *Jeffery V. Stuckey),* and *Hugh F. Young, Jr.,* for Product Liability Advisory Council, Inc.

*Bendure & Thomas (by Mark R. Bendure* and *Kevin P. Kavanagh), Sachs, Waldman, O'Hare, Helveston, Bogan & McIntosh, P.C. (by Andrew A. Nickelhoff),* and *Jordan Rossen* and *Thomas C. Carey,* for AFL-CIO and UAW.

*Thomas K. Byerley* for State Bar of Michigan.

*John E. Johnson, Jr.*, and *Richard E. Shaw* for Detroit Chapter of the NAACP.

*Granzotto & Nicita, P.C.* (by *Angela J. Nicita*), for Michigan Trial Lawyers Association, Michigan Consumer Federation, Citizens for Better Care, and Brain Injury Associations of Michigan.

*Kitch, Drutchas, Wagner & Kenney, P.C.* (by *Susan Healy Zitterman, Linda M. Garbarino*, and *Christina A. Ginter*), for Michigan Health and Hospital Association.

*Siemion, Huckabay, Bodary, Padilla, Morganti & Bowerman, P.C.* (by *Raymond W. Morganti*), for PICOM Insurance Company.

*Gross, Nemeth & Silverman, P.L.C.* (by *James G. Gross*), for Michigan Defense Trial Counsel.

*Kerr, Russell & Weber, P.L.C.* (by *Richard D. Weber* and *Joanne G. Swanson*), for Michigan State Medical Society.

YOUNG, J. We granted leave to appeal in these consolidated cases to determine whether MCL 600.2169; MSA 27A.2169, which provides strict requirements for the admission of expert testimony in medical malpractice cases brought against specialists, impermissibly infringes this Court's exclusive authority under Const 1963, art 6, § 5, to promulgate rules governing practice and procedure in Michigan courts. We conclude that § 2169 is an enactment of substantive law. Therefore, we uphold the statute as a valid exercise of the Legislature's public policy-making prerogative.

I. FACTUAL AND PROCEDURAL BACKGROUND

A. *McDOUGALL*

Plaintiff's wife, Sandra McDougall, became ill on August 27, 1990. As a result, Mrs. McDougall visited her family physician who confirmed Mrs. McDougall's belief that she was pregnant. Mrs. McDougall was then referred to an obstetrician-gynecologist, but was eventually sent home. The next day, Mrs. McDougall went to Garden City Hospital complaining of nausea, vomiting, and troubled breathing. She was treated by defendant Reuben Eliuk, D.O., a specialist in internal medicine. However, Mrs. McDougall died, allegedly from resultant complications of undiagnosed diabetes.

In 1991, plaintiff brought suit against Dr. Eliuk, the hospital, and several other physicians. Plaintiff offered Glen Mark Robia, M.D., as his expert to establish the standard of care owed by Dr. Eliuk. Like Dr. Eliuk, Dr. Robia is also board certified in internal medicine. However, he has not practiced in this field for some time. Primarily, Dr. Robia works as a pathologist (as well as serving as chief of staff of a small hospital) and county coroner in Minnesota, where he lives. Dr. Robia testified in his deposition that his full-time, active practice of internal medicine began in 1979 and ended in 1982.[1]

The trial court granted Dr. Eliuk's motion in limine to exclude Dr. Robia's testimony on the ground that Dr. Robia was not qualified under MCL 600.2169;

---

[1] Dr. Robia testified that he practiced internal medicine on a limited "moonlight basis" until 1985.

MSA 27A.2169. At that time, the statute provided, in relevant part, as follows:

(1) In an action alleging medical malpractice, if the defendant is a specialist, a person shall not give expert testimony on the appropriate standard of care unless the person is or was a physician licensed to practice medicine or osteopathic medicine and surgery or a dentist licensed to practice dentistry in this or another state and meets both of the following criteria:

(a) Specializes, or specialized at the time of the occurrence which is the basis for the action, in the same specialty or a related, relevant area of medicine or osteopathic medicine and surgery or dentistry as the specialist who is the defendant in the medical malpractice action.

(b) Devotes, or devoted at the time of the occurrence which is the basis for the action, a substantial portion of his or her professional time to the active clinical practice of medicine or osteopathic medicine and surgery or the active clinical practice of dentistry, or to the instruction of students in an accredited medical school, osteopathic medical school, or dental school in the same specialty or a related, relevant area of health care as the specialist who is the defendant in the medical malpractice action.

(2) In determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, evaluate all of the following:

(a) The educational and professional training of the expert witness.

(b) The area of specialization of the expert witness.

(c) The length of time the expert witness has been engaged in the active clinical practice or instruction of medicine, osteopathic medicine and surgery, or dentistry.

(d) The relevancy of the expert witness's testimony.

(3) This section does not limit the power of the trial court to disqualify an expert witness on grounds other than the qualifications set forth in this section. [MCL 600.2169; MSA 27A.2169.][2]

---

[2] The statute was subsequently amended in 1993, resulting in changes that are not important for purposes of our decision. The parties have stip-

The court rejected plaintiff's argument that the statute is unconstitutional, concluding instead that § 2169 and MRE 702, governing the admission of expert testimony,[3] are complementary.[4]

The Court of Appeals affirmed in part and reversed in part. 218 Mich App 501; 554 NW2d 56 (1996). The Court of Appeals majority determined that § 2169 conflicts with MRE 702 and, moreover, that the statute is an unconstitutional violation of this Court's rule-making authority. Judge TAYLOR dissented, arguing that, because § 2169 is "more akin to a substantive law than a procedural rule," *id.* at 516, it takes precedence over MRE 702. We granted leave to appeal. 456 Mich 905 (1997).

### B. *SOBRAN*

Plaintiff[5] John Sobran was diagnosed with colon cancer in 1976. That same year, plaintiff's personal

---

ulated that only the original, 1986 version of the statute is at issue in these consolidated cases. Moreover, given that the 1986 and 1993 versions of the statute interact with MRE 702 in the same manner, our decision applies with equal force to the 1993 version. We do note that the requirements contained in the 1993 version of the statute are even more restrictive than the 1986 version.

[3] MRE 702 provides:

> If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[4] Plaintiff conceded that Dr. Robia is not qualified under § 2169 to give standard-of-care testimony against Dr. Eliuk.

[5] The claims of John Sobran's wife, plaintiff Carole Sobran, are purely derivative in nature. For the sake of simplicity, all references in this opinion to "plaintiff" will be to John Sobran only.

physician, Dr. Thomas Fox, performed an ileostomy.[6] Fifteen years later, in 1991, plaintiff began experiencing abdominal pain. He was eventually referred to defendant, Dr. Alasdair McKendrick, a board-certified colorectal surgeon. Defendant diagnosed an ileostomy dysfunction and recommended another surgery to improve the ileostomy. This operation was performed in December 1991, but it did not improve plaintiff's complaint of abdominal pain. After six months of unsuccessful treatment with defendant, plaintiff returned to Dr. Fox.

Dr. Fox performed a sigmoidoscopy[7] on September 14, 1992. As a result, Dr. Fox found polyps blocking plaintiff's intestinal tract. He performed surgery in January 1993 and successfully removed the polyps.

Plaintiff filed a medical malpractice suit against defendant, alleging that defendant should have performed a sigmoidoscopy in 1991. Plaintiff claimed that, had defendant done so, he would have discovered the polyps over a year before the examination performed by Dr. Fox.

Plaintiff offered Dr. Mark Caminker as his expert to establish the standard of care owed by defendant. While Dr. Caminker is board certified in internal medicine and gastroenterology he is not a colorectal surgeon. However, Dr. Caminker testified in his deposition that internists and surgeons follow the same standards of care for the diagnosis of gastrointestinal

---

[6] An ileostomy is a surgical procedure involving the creation of an opening in the patient's abdomen. Fecal matter can then move through the opening from the intestines into an attached external bag rather than through the lower alimentary canal in the normal course.

[7] This procedure enables a physician to view the patient's intestinal tract through a scope inserted into the alimentary canal.

problems and for the performance of diagnostic procedures such as sigmoidoscopy.

Shortly before trial was scheduled to begin, defendant sought to exclude Dr. Caminker's proffered expert testimony. Defendant argued in relevant part that Dr. Caminker was not qualified under MCL 600.2169; MSA 27A.2169 to testify regarding the standards of care applicable to colorectal surgeons. The trial court granted defendant's motion and, after declining to allow plaintiff additional time to locate another expert, dismissed plaintiff's claim with prejudice.

Plaintiff appealed to the Court of Appeals, raising the constitutionality of MCL 600.2169; MSA 27A.2169. The Court acknowledged that § 2169 had been declared unconstitutional by the Court of Appeals panel in *McDougall*, and that the trial court's ruling was based upon the statute.[8] Nevertheless, the Court upheld the trial court's ruling on the ground that Dr. Caminker was not qualified under MRE 702, a ground that was neither argued before nor decided by the trial court. We granted leave to appeal, and specifically ordered the parties to address the question whether the statute is invalid as in conflict with MRE 702. 456 Mich 905 (1997).

## II. STANDARD OF REVIEW

The constitutionality of § 2169 presents a question of law. We review questions of law de novo. *Cardinal Mooney High School v Michigan High School Athletic*

---

[8] Unpublished opinion per curiam of the Court of Appeals, issued April 11, 1997 (Docket No. 185581). The Court was, of course, bound by the *McDougall* panel's determination under Administrative Order No. 1996-4 (currently MCR 7.215[H]).

*Ass'n,* 437 Mich 75, 80; 467 NW2d 21 (1991). Also relevant to our assessment of § 2169's validity is the well-established rule that a statute is presumed to be constitutional unless its unconstitutionality is clearly apparent. *Johnson v Harnischfeger Corp,* 414 Mich 102, 112; 323 NW2d 912 (1982); *People v Bricker,* 389 Mich 524, 528; 208 NW2d 172 (1973).

### III. ANALYSIS

#### A. DO § 2169 AND MRE 702 CONFLICT?

We first consider whether § 2169 and MRE 702 can be construed so as not to conflict, thus making it unnecessary to reach the constitutional question. When there is no inherent conflict, "[w]e are not required to decide whether [the] statute is a legislative attempt to supplant the Court's authority." *People v Mateo,* 453 Mich 203, 211; 551 NW2d 891 (1996). "We do not lightly presume that the Legislature intended a conflict, calling into question this Court's authority to control practice and procedure in the courts." *People v Dobben,* 440 Mich 679, 697, n 22; 488 NW2d 726 (1992).

According to defendants, § 2169 and MRE 702 do not conflict. Rather, defendants in both cases maintain that the statute serves merely to aid the court in applying the rule and that the ultimate decision whether to admit expert testimony rests with the trial court. We cannot agree with defendants' characterization of the relationship between § 2169 and MRE 702.

While MRE 702 authorizes expert testimony on the basis of "knowledge, skill, experience, training, or education," the statute operates to preclude certain witnesses from testifying solely on the basis of the

witness' lack of practice or teaching experience in the relevant specialty. Anyone qualified by virtue of the MRE 702 criteria of skill, training, or education could nonetheless be excluded under the statute's strict practice or teaching requirements. Indeed, as the Court of Appeals in *McDougall* correctly noted, the trial court in that case considered Dr. Robia to be qualified under MRE 702. However, the trial court's discretion to permit Dr. Robia's expert testimony was limited by § 2169's practice or teaching requirements.

Finally, it appears beyond dispute that the Legislature envisioned and intended that the statute would often compel different qualification determinations than the rule when applied to a given case. As Judge TAYLOR noted in his dissent in *McDougall*, the Legislature became dissatisfied with the manner in which some courts were exercising their discretion regarding expert testimony, and enacted a statute designed to limit that discretion.[9] Accordingly, given that

[9] Quoting the *Report of the Senate Select Committee on Civil Justice Reform*, issued September 26, 1995, Judge TAYLOR's dissent noted:

"As a practical matter, in many courts merely a license to practice medicine is needed to become a medical expert on an issue.

"This has given rise to a group of national professional witnesses who travel the country routinely testifying for plaintiffs in malpractice actions. These 'hired guns' advertise extensively in professional journals and compete fiercely with each other for the expert witness business. For many, testifying is a full-time occupation and they rarely actually engage in the practice of medicine. There is a perception that these so-called expert witnesses will testify to whatever someone pays them to testify about.

"This proposal is designed to make sure that expert witnesses actually practice or teach medicine. In other words, to make sure that experts will have firsthand practical expertise in the subject matter about which they are testifying. In particular, with the malpractice crisis facing high-risk specialists, such as neurosurgeons, orthopedic surgeons and ob/gyns, this reform is necessary to insure that in malpractice suits against specialists the expert witnesses

§ 2169 and MRE 702 clearly conflict, we must determine whether the statute impermissibly infringes upon this Court's constitutional authority to enact rules governing practice and procedure.

### B. CONST 1963, ART 6, § 5

It is beyond question that the authority to determine rules of practice and procedure rests exclusively with this Court. Indeed, this Court's primacy in such matters is established in our 1963 Constitution:

> The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state.[10]

This exclusive rule-making authority in matters of practice and procedure is further reinforced by separation of powers principles. See Const 1963, art 3, § 2; *In re 1976 PA 267*, 400 Mich 660; 255 NW2d 635 (1977). Thus, in *Perin v Peuler (On Rehearing)*, 373

---

actually practice in the same speciality. This will protect the integrity of our judicial system by requiring real experts instead of 'hired guns.' " [218 Mich App 509, n 1 (TAYLOR, P.J., dissenting).]

[10] This rule-making power also existed under our predecessor constitutions. Const 1908, art 7, § 5, provided:

> The supreme court shall by general rules establish, modify and amend the practice in such court and in all other courts of record, and simplify the same.

Applying this provision in *Berman v Psiharis*, 325 Mich 528, 533; 39 NW2d 58 (1949), we held that Court Rule No 26, § 1 (1945), which provided for the amendment of a pleading as of right "at any time before answer is put in, or within 15 days thereafter," superseded a contrary statute requiring leave of the court.

By the same token, Const 1850, art 6, § 5, stated:

> The supreme court shall, by general rules, establish, modify, and amend the practice in such court and in the circuit courts, and simplify the same.

Mich 531, 541; 130 NW2d 4 (1964), we properly emphasized that "[t]he function of enacting and amending judicial rules or practice and procedure has been committed exclusively to this Court . . . ; a function with which the legislature may not meddle or interfere save as the Court may acquiesce and adopt for retention at judicial will."

At the same time, it cannot be gainsaid that this Court is not authorized to enact court rules that establish, abrogate, or modify the substantive law. *Shannon v Ottawa Circuit Judge*, 245 Mich 220, 223; 222 NW 168 (1928). Rather, as is evident from the plain language of art 6, § 5, this Court's constitutional rule-making authority extends *only* to matters of practice and procedure.[11] *Shannon, supra* at 222-223. Accordingly, in order to assess the constitutionality of MCL 600.2169; MSA 27A.2169, we must determine whether the statute addresses purely procedural matters or substantive law.[12]

### C. SECTION 2169: A MATTER OF SUBSTANTIVE LAW OR PROCEDURE?

We are faced in these cases with a statutory provision that undoubtedly acts as a rule of evidence.

---

[11] This is a point that the dissent purports to acknowledge, but then immediately disregards. *Post* at 53-55. The essence of the dissent's position is that, if this Court creates a rule of evidence, that rule is, ipse dixit, one encompassing only procedure. No doctrinal support for this proposition is offered. That this Court has the *power* to declare that a matter of substance is procedure is no answer to the question whether it has the constitutional *authority* to do so. Certainly, there is no indication in this Court's rules or public statements suggesting that, in enacting rules of evidence, this Court even considers whether such rules encroach upon substantive policy questions.

[12] To the extent that the term "practice" encompasses more than in-court "procedure," that issue is not before us.

Indeed, as previously discussed, § 2169 contains strict requirements concerning the qualification of expert witnesses in medical malpractice cases. The statute affects what expert testimonial evidence may be admitted in the trial of such cases.

Plaintiffs in both cases, along with the dissent, simply contend that all "rules of evidence" are procedural in nature. Therefore, plaintiffs argue, because § 2169 purports to govern the admissibility of standard of care testimony in medical malpractice actions involving specialists, it represents an impermissible infringement on this Court's rule-making power. As would be expected, plaintiffs rely primarily on this Court's decision in *Perin*.

In *Perin*, this Court considered the validity of a statute prohibiting the admission in *any* civil action of evidence relating to a violation of the motor vehicle code.[13] The Court found the statute to be of no effect to the extent that it conflicted with longstanding rules of evidence relating to impeachment of witness credibility. In doing so, the *Perin* Court declared that this Court's constitutional authority regarding practice and procedure "include[s]," of course, the "rules of evidence":

> "The judicial function constitutionally empowers *the courts to make their own rules of procedure*, including rules of evidence (subject only to specific constitutional limitations). Virtually all of the original rules of evidence were invented by the courts. . . .

---

[13] At the time *Perin* was decided, MCL 257.731; MSA 9.2431 provided: "No evidence of the conviction of any person for any violation of this chapter or of a local ordinance pertaining to the use of motor vehicles shall be admissible in any court in any civil action."

"In recent times, the just prerogative of the courts to make their own rules of procedure has been vindicated in professional opinion; and a healthy movement to relegate generally procedure *to* the courts has long been under way. That this prerogative of the courts includes the power to formulate and to alter the rules of evidence ought not to be doubted." [*Id.* at 541-542 (emphasis in original; citation omitted).]

However, as authority for this proposition, the *Perin* Court relied, not on an analysis of the text of art 6, § 5, but on the 1962 pocket supplement for 1 Wigmore, Evidence (3d ed). Since *Perin*, this Court, again without any apparent consideration of the meaning of "practice and procedure" as stated in art 6, § 5, has reaffirmed *Perin*'s broad statement of our authority over all matters relating to the admission of evidence. See, e.g., *People v Mitchell*, 402 Mich 506; 265 NW2d 163 (1978); *People v Jackson*, 391 Mich 323; 217 NW2d 22 (1974); *Buscaino v Rhodes*, 385 Mich 474; 189 NW2d 202 (1971).

However, we now recognize that the *Perin* Court failed to consider the constitutionally required distinction between "practice and procedure" and substantive law and thus overstated the reach of our rule-making authority. We will not continue mechanically to characterize all statutes that resemble "rules of evidence" as relating solely to practice and procedure. Such an analysis merely begs the question what makes a particular "rule of evidence" procedural as opposed to substantive in nature. We instead adopt a more thoughtful analysis that takes into account the undeniable distinction "between *procedural* rules of evidence and evidentiary rules of substantive law . . . ." *Golden v Baghdoian*, 222 Mich App 220, 225; 564 NW2d 505 (1997) (emphasis in original). This

distinction is one that was not only advocated by rec-
ognized scholars contemporaneously with the devel-
opment and passage of our 1963 Constitution,[14] but
one that, as further explained below, the drafters
contemplated.

We conclude that a statutory rule of evidence vio-
lates Const 1963, art 6, § 5 only when " 'no clear legis-
lative policy reflecting considerations other than judi-
cial dispatch of litigation can be identified . . . .' "
*Kirby v Larson*, 400 Mich 585, 598; 256 NW2d 400
(1977) (opinion of WILLIAMS, J.), citing 3 Honigman &
Hawkins, Michigan Court Rules Annotated (2d ed),
p 404;[15] see also Joiner & Miller, *Rules of practice
and procedure: A study of judicial rule making*, 55
Mich L R 623, 650-651 (1957). Therefore, "[i]f a par-
ticular court rule contravenes a legislatively declared

---

[14] See Joiner & Miller, *Rules of practice and procedure: A study of
judicial rule making*, 55 Mich L R 623, 635, 650-651 (1957).

[15] Honigman and Hawkins further explain the distinction between pro-
cedural and substantive "rules of evidence":

> In general, those rules of evidence designed to allow the adjudi-
> catory process to function effectively are procedural in nature, and
> therefore subject to the rule-making power. Examples are rules of
> evidence designed to let the jury have evidence free from the risks
> of irrelevancy, confusion and fraud. *On the other hand certain
> rules of evidence are inextricably involved with legal rights and
> duties. They are substantive declarations of policy, although they
> may be drafted in terms of the admission or exclusion of evi-
> dence. . . .* [*Id.*, p 403.]

The dissent, *post* at 57-59, questions our reliance on this commentary
because the authors, in discussing MCL 257.731; MSA 9.2431 (the very
same provision at issue in *Perin*), concluded that the statute was super-
seded by court rule even though "[t]wo different legislative policies *might*
lie behind Section 731." See Honigman & Hawkins, *supra* (emphasis
added). If the dissent were entirely forthcoming, it would have noted that
what the authors of the commentary *actually* concluded was that "the leg-
islative policy behind [the statute] is not clear." *Id.* If such policy had been
clear, the authors concluded, "it would raise a serious question as to the
validity of [the court rule]."

principle of public policy, having as its basis some-
thing other than court administration . . . the [court]
rule should yield." Joiner & Miller, *supra* at 635. We
agree with Professor Joiner that

> [m]ost rules of evidence have been made by courts. Now
> and then the legislature has, as a result of policy considera-
> tion over and beyond matters involving the orderly dispatch
> of judicial business, enacted rules of evidence. The distinc-
> tion previously pointed out between policy considerations
> involving the orderly dispatch of judicial business on the
> one hand and policy considerations involving something
> more than that on the other hand is the distinction that
> must be carried through into the evidence field. [*Id.* at 650-
> 651.][16]

We conclude that this common-sense approach
properly gives effect to the constitutionally required
distinction between "practice and procedure" and
substantive law. While we acknowledge that the ana-
lytical exercise required will not always be an easy
one, it certainly is not novel. In *People v McKenna*,
196 Colo 367, 371-372; 585 P2d 275 (1978), the Colo-
rado Supreme Court, applying a provision of the Colo-

---

[16] We find curious the dissent's suggestion that, because many of our
rules of evidence are undergirded by judicially recognized "policy" deter-
minations, such policies are inherently procedural in nature and thus
beyond the constitutional power of the Legislature to change. *Post* at 59-
64. We also find it at least a debatable proposition that a court-enacted
rule of evidence embodying public policy affecting broad social and com-
mercial interests is, as the dissent would have it, immune from legislative
change.

Thus, without being drawn into the dissent's invitation to decide hypo-
thetical cases not before us, we simply observe that it is not ineluctably
clear, for example, that MRE 407's exclusion of evidence of subsequent
remedial measures is one having so few substantive policy implications
that the Legislature has no constitutional authority to enact an alternative
policy. It can hardly be argued that MRE 407 encompasses no important
policies involving commerce or legal rights.

rado Constitution that is substantially similar to Const 1963, art 6, § 5,[17] upheld that state's "rape shield" statute in large part because it "represents far more than merely a legislative attempt to regulate the day-to-day procedural operations of the courts." *Id.* at 372. See also *Nolan v Sea Airmotive, Inc*, 627 P2d 1035, 1042 (Alas, 1981). To the extent that this Court's prior decision in *Perin* and its progeny suggest that all statutes affecting the admission of evidence are procedural, they are overruled.

Plaintiffs argue, and the dissent agrees, that the drafters of our 1963 Constitution manifested their intent that the Legislature not be permitted in any fashion to intrude upon this Court's power to determine "rules of evidence" when the drafters considered and rejected the following proposed amendment of art 6, § 5:

> The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts in the state, it being provided that where there is a conflict between supreme court rule and a statute concerning evidence or substantive law the statute shall prevail. [1 Official Record, Constitutional Convention 1961, p 1289.][18]

Plaintiffs also direct our attention to the following comments made by Delegate Robert J. Danhof in opposition to the proposed amendment:

---

[17] Colo Const, art 6, § 21 provides in relevant part that "[t]he supreme court shall make and promulgate rules governing the administration of all courts and shall make and promulgate rules governing practice and procedure in civil and criminal cases . . . ."

[18] The amendment was offered by Delegates Ann E. Donnelly, Karl K. Leibrand, and Thomas R. McAllister.

Rules of evidence have historically been made by the courts over the years. They have developed through usage, through practice, through various cases, and with but very few exceptions except as relates to presumptions and privileges, the rules of evidence as to what may be introduced are and should continue to be a court function. The legislature may write statutes as they relate to the substantive law, but the rulemaking power of the court as it relates to the admission of evidence should not be limited, as this would do.

Again we have here something which shows a consistent pattern to endeavor to restrict and tie in knots the administration of justice in the operation of our supreme court. I think too often we tend to let the personalities of the court personnel interfere with our consideration of the system. If there is one thing this committee should do, it is to try to set up a good system, and then find ways by which we can staff the system by the fairest means. Every single authority in the field of administration of court decisions has held that the power of rulemaking over evidence, and so on, and practice and procedure should not be tampered with. [*Id.*]

By quoting only select portions of the convention debates, plaintiffs and the dissent have mischaracterized the thrust of the debates regarding the proposed amendment. The delegates opposing the amendment expressed concern that it undercut this Court's rulemaking authority over practice and procedure by deeming *all* rules of evidence to be substantive law and thus the province of the Legislature. Even the delegates opposing the amendment recognized that rules of evidence can be procedural, substantive or a combination of both. One of the amendment's primary opponents, Delegate William D. Ford, explained:

When we are talking about the lines between substantive law and procedural law, not all of us are as positive as

[Delegate Ann E.] Donnelly that we know when we cross over this line from one to the other.

*     *     *

And the danger we see in trying to create this distinction as if it were a clear cut line between the 2 is that we are opening the door for all sorts of litigation to start confusing the future rulemaking power of the court . . . . [*Id.* at 1291.]

Another opponent, Delegate Melvin Nord, also acknowledged that there may indeed be a distinction between substantive and procedural rules of evidence:

Now, the question I was asked by [Delegate Eugene G.] Wanger is a very tough question, that is to say, *should evidence be counted as procedure or not. Normally it is. Possibly there are some rules that should not be. We know that it is a difficult line between procedure and substantive in some cases. And, as a matter of fact, the same subject matter will sometimes be called substantive and sometimes procedural depending on the context.* [*Id.* at 1292 (emphasis added).]

Delegate Nord further summarized his concerns:

The question that has never really been determined at all is how far this word "procedure" goes. There we are shooting out into the dark. Now, in my opinion, if we attempt to settle this question here, then we change our minds from where we were a few days ago. A few days ago we said the judicial power shall be exclusively in the court, and now we are saying, basically, it shall be exclusively in the constitutional convention, that we are going to determine in advance everything that is procedural and everything that isn't. We are going to make up our minds now [by approving the proposed amendment] that all evidence is not procedural. [*Id.*]

We think it clear from a reading of the *entire* debate concerning the proposed amendment that the drafters of our 1963 Constitution believed, not that rules of evidence are always procedural, but that the proposed amendment was unwise in that it would forever have determined that evidentiary rules are always substantive. Thus, the convention debates actually support the distinction we here recognize and draw between substantive and procedural "rules of evidence."

Applying the substance/procedure analysis set forth above, we conclude that § 2169 is an enactment of substantive law. It reflects wide-ranging and substantial policy considerations relating to medical malpractice actions against specialists. We agree with the Court of Appeals dissent in *McDougall* that the statute

> reflects a careful legislative balancing of policy considerations about the importance of the medical profession to the people of Michigan, the economic viability of medical specialists, the social costs of "defensive medicine," the availability and affordability of medical care and health insurance, the allocation of risks, the costs of malpractice insurance, and manifold other factors, including, no doubt, political factors—all matters well beyond the competence of the judiciary to reevaluate as justiciable issues. [218 Mich App 518 (TAYLOR, P.J., dissenting).]

Clearly then, the statute does not involve the mere dispatch of judicial business.[19]

---

[19] However dissatisfied the dissent may be with the legislative determination that led to the enactment of § 2169, there unquestionably is an extensive record (frequently quoted in the dissent) establishing the policy concerns of our Legislature regarding the medical malpractice crisis it believed the state of Michigan faced and the policy choices that influenced its enactment of § 2169 to redress the crisis.

We also agree with the *McDougall* dissent that, because the Legislature is authorized to change a common-law cause of action or abolish it altogether, *O'Brien v Hazelet & Erdal*, 410 Mich 1, 15; 299 NW2d 336 (1980), it necessarily has the ability to "circumscrib[e] those qualified to give the requisite proofs to establish the elements of the cause of action." 218 Mich App 518 (TAYLOR, P.J., dissenting). The applicable standard of care is an essential element in a medical malpractice action. *Locke v Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994). Section 2169 essentially modifies that element to require that proof of malpractice "emanate from sources of reliable character as defined by the Legislature." 218 Mich App 518 (TAYLOR, P.J., dissenting). As stated, we will not declare a statute to be violative of art 6, § 5 merely because it is drafted in terms of the admission or exclusion of evidence.

### IV. CONCLUSION

We appreciate the difficulty that attends the drawing of the line between "practice and procedure" and substantive law. That the task is difficult and one that must be made on a case-by-case basis is no legitimate challenge to our constitutional duty to draw that line in a fashion that respects this Court's constitutional authority as well as that of the Legislature. The rule we adopt today recognizes the difficulty inherent in

---

The dissent agrees with us that the Legislature "is better equipped to undertake a deliberative approach to making policy decisions." *Post* at 55. However, the dissent proceeds to reject the Legislature's finding of a health care crisis because such a finding does not conform to the dissent's world view—one which the dissent must admit is informed, at best, by anecdotal "evidence."

this line-drawing task—one that the drafters of the 1963 Constitution themselves acknowledged. See *supra* at 32-34.

Finally, despite the dissent's apparent anxiety about our supposed lack of fidelity to the protection of "judicial turf," we merely note that it is ultimately this Court that will determine in each instance where the substance/procedure line must be drawn.

We conclude that MCL 600.2169; MSA 27A.2169 is an enactment of substantive law. As such, it does not impermissibly infringe this Court's constitutional rule-making authority over "practice and procedure."

In *McDougall*, we reverse the judgment of the Court of Appeals and reinstate the trial court's grant of summary disposition in favor of defendant Eliuk.

In *Sobran*, the Court of Appeals relied on MRE 702 to affirm the trial court's grant of summary disposition to defendant McKendrick, despite the fact that the parties never argued the application of MRE 702 and the trial court never ruled on the issue. We do not reach the propriety of that decision because it is clear that the trial court correctly granted summary disposition under § 2169. Accordingly, we affirm the judgment of the Court of Appeals because it reached the correct result.

WEAVER, C.J., and BRICKLEY and CORRIGAN, JJ., concurred with YOUNG, J.

TAYLOR, J., concurred with YOUNG, J., in *Sobran* only, and took no part in the decision in *McDougall*.

CAVANAGH, J. (*dissenting*). We are called on to determine whether the statutorily provided restrictions on expert witnesses in medical malpractice actions, MCL

600.2169; MSA 27A.2169, represent an impermissible intrusion on the constitutional rule-making authority of this Court. For the reasons detailed below, I would find that the statute is an impermissible legislative usurpation of the judiciary's authority and, thus, is unconstitutional. The majority, however, rather than merely reaching the opposite conclusion, has elected to redefine those barriers that have heretofore existed as the lines of demarcation between the three equal branches of our government, and, in doing so, not only to permit, but even court limitation by, the Legislature of the judiciary's role. While the effects of such action may well, given the Legislature's current composition, be pleasing to the majority of the Court today, the majority has invited a stampede over a fence created by our constitution's framers. I would not quibble with constitutional boundaries that have existed long before the impetus for the current, result-specific statutory enactment, and in looking beyond such an impetus and to those traditional borders, I must dissent.

I

A

At issue in these cases is the interaction of the statute in question, MCL 600.2169; MSA 27A.2169, with MRE 702. Both concern the qualifications of an expert witness to give testimony. MRE 702 is a general rule of evidence, while § 2169 pertains only to medical and dental malpractice actions. At the outset, it is helpful to present the contents of each.

The original version of the statute at issue, the 1986 version, reads as follows in the relevant section:

(1) In an action alleging medical malpractice, if the defendant is a specialist, a person shall not give expert testimony on the appropriate standard of care unless the person is or was a physician licensed to practice medicine or osteopathic medicine and surgery or a dentist licensed to practice dentistry in this or another state and meets both of the following criteria:

(a) Specializes, or specialized at the time of the occurrence which is the basis for the action, in the same specialty or a related, relevant area of medicine or osteopathic medicine and surgery or dentistry as the specialist who is the defendant in the medical malpractice action.

(b) Devotes, or devoted at the time of the occurrence which is the basis for the action, a substantial portion of his or her professional time to the active clinical practice of medicine or osteopathic medicine and surgery or the active clinical practice of dentistry, or to the instruction of students in an accredited medical school, osteopathic medical school, or dental school in the same specialty or a related, relevant area of health care as the specialist who is the defendant in the medical malpractice action. [MCL 600.2169; MSA 27A.2169.]

In 1993, the Legislature amended the statute, providing additional requirements for admission of expert testimony. The 1993 amendments made substantial changes, as can been seen below.

(1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who

is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(i) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

(ii) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

(c) If the party against whom or on whose behalf the testimony is offered is a general practitioner, the expert witness, during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(i) Active clinical practice as a general practitioner.

(ii) Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed. [MCL 600.2169;  MSA 27A.2169.]

As noted, this Court has long provided a court rule, MRE 702,  that outlines the requirements for admissibility of expert testimony:

If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. [MRE 702.]

B

The constitutional doctrine of separation of powers in Michigan can be traced to our first constitution, which predated even our statehood.[1] Since then, it has continued to be embodied in each of our successive state constitutions.[2] It is found in our current constitution:

> The powers of the government are divided into three branches; legislative, executive and judicial. No person exercising the powers of one branch shall exercise the powers properly belonging to another branch except as expressly provided in this constitution. [Const 1963, art 3, § 2.]

Writing for this Court, Justice COOLEY offered the following analysis of the basis of this doctrine, and reasoning to which the intervening years and decisions have had little to add:

> Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. One makes the laws, another applies the laws in contested cases, while the third must see that the laws are executed. This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others. The executive is for-

---

[1]    The powers of the government shall be divided into three distinct departments; the Legislative, the Executive and the Judicial; and one department shall never exercise the powers of another, except in such cases as are expressly provided for in this constitution. [Const 1835, art 3, § 1.]

[2] See Const 1850, art 3, §§ 1 and 2, and Const 1908, art 4, §§ 1 and 2.

> bidden to exercise judicial power by the same implication which forbids the courts to take upon themselves his duties. [*Sutherland v Governor*, 29 Mich 320, 324-325 (1874).]

Until today, we have found no reason to depart from this longstanding doctrine in our recent decisions. As we have noted, "an indispensable ingredient of the concept of coequal branches of government is that 'each branch must recognize and respect the limits on its own authority and the boundaries of the authority delegated to the other branches.'" *Employees & Judges of the Second Judicial Dist Court v Hillsdale Co*, 423 Mich 705, 717; 378 NW2d 744 (1985).

C

As a prelude to the analysis of the instant case, I note that, heretofore, it has been without question that the authority to determine rules of procedure in judicial matters rests exclusively with the judiciary and this Court. As we noted in *Perin v Peuler (On Rehearing)*, 373 Mich 531, 541-542; 130 NW2d 4 (1964), this rule-making authority can be traced from our earlier constitutions[3] to its present inception:

> The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state. The distinctions between law and equity proceedings shall, as far as practicable, be abolished. The office of master in chancery is prohibited. [Const 1963, art 6, § 5.]

---

[3] See Const 1908, art 7, § 5.

As we made clear in *Perin*[4] at 541, "[t]he function of enacting and amending judicial rules of practice and procedure has been committed exclusively to this Court; a function with which the Legislature may not meddle or interfere save as the Court may acquiesce and adopt for retention at judicial will." (Citations omitted.) Indeed, as will be seen below, our decisions in this regard have, to date, been so consistent that the legislative analysis prepared in the course of the drafting of this statute foresaw this very problem.[5]

In our prior cases as well, beginning long before *Perin*, we have held that, where a statute and court rule conflict, the court rule shall control, absent the sort of acquiescence alluded to in *Perin*. *Berman v Psiharis*, 325 Mich 528, 533; 39 NW2d 58 (1949); *In re Koss Estate*, 340 Mich 185, 189-190; 65 NW2d 316 (1954).[6]

While such an acquiescence to a statute that intrudes upon a court rule has not been often forthcoming, I note that, on occasion, this Court has sidestepped issues such as this, and because such occasions are now offered by the defendant and the dis-

---

[4] The majority's opinion, of course, visits on *Perin* a mortal wound that eventually will lead to its death, absent a subsequent composition of this Court becoming less satisfied with the direction of the Legislature than the current majority is. While I will discuss the effect of *Perin*'s demise below, it is useful to note here that, rather than slay a longstanding guardian of our constitutional boundaries, I would heed it, and therefore will view it as contributing to this decision, rather than as merely a foe to be vanquished.

[5] See our discussion of House Legislative Analysis Section on HB 5169, pp 2-3, issued November 20, 1985, *post* at 48-49.

[6] See also *Byrne v Gypsum Plaster & Stucco Co*, 141 Mich 62; 104 NW 410 (1905), where the Court, declining to address the merits of an issue regarding a purported conflict between a court rule and statute, simply opined that the rule would control.

sent below as examples of such acquiescence, they may usefully be reviewed here.

In *People v Daniels*, 394 Mich 524; 232 NW2d 171 (1975), a memorandum opinion, we held that a statute dealing with one situation would be given precedence over a court rule dealing with another situation, both of which concerned the availability of a personal recognizance bond, when both applied to the same individual. It is fair to say that over the course of the three paragraphs that comprise *Daniels*, this Court did not consider the constitutional question raised here today.

More recently, in *People v Adair*, 452 Mich 473; 550 NW2d 505 (1996), we were called on to interpret our rape-shield statute.[7] We were not, however, presented with the constitutional question we face today. Indeed, while we have adopted a court rule dealing with some aspects of the rape-shield statute,[8] and

---

[7] The rape-shield statute provides:

Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under sections 520b to 520g unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:

(a) Evidence of the victim's past sexual conduct with the actor.

(b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease. [MCL 750.520j(1); MSA 28.788(10)(1).]

[8] MRE 404(a)(3) provides:

*Character of victim of sexual conduct crime.* In a prosecution for criminal sexual conduct, evidence of the victim's past sexual conduct with the defendant and evidence of specific instances of sexual activity showing the source or origin or semen, pregnancy, or disease . . . .

have another general rule which arguably covers certain aspects included in the statute,[9] we nonetheless confined our analysis solely to the statute. While this analysis was limited to the question presented, we noted in dicta the potential conflict of MRE 403 with certain language of the rape-shield statute, which was not directly disputed in the case before us.[10]

Although we did little more than note the potential conflict that appeared on the face of the statute, it is fair to say that our opinion on this point has resulted in some disagreement and academic debate regarding how we intended to address this conflict.[11] Today we find the defendants arguing that our approach in *Adair* amounted to a silent acquiescence, and thus a "softening" of our view of legislative enactments that intrude into court rules. While it appears that open questions may remain concerning the interaction of

---

[9] MRE 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[10] MRE 403 provides that even relevant evidence may be excluded if its probative value is outweighed by prejudicial considerations. The rape-shield statute reflects this evidentiary postulate, but with a significant modification. MRE 403 calls for the exclusion of probative evidence when "substantially" outweighed by prejudicial considerations. *Adair*, 452 Mich 481.

It is certainly arguable, however, that the Court in *People v Hackett*, 421 Mich 338, 351; 365 NW2d 120 (1984), resolved this question by adopting the MRE 403 standard for rape-shield questions. The interesting discussions surrounding this issue, some of which are cited below, point to the dangers of relying on dicta that do not fully or finally address the collateral issue being discussed.

[11] See, e.g., Robinson, Michigan Court Rules Practice: Evidence, § 404.4 (1998 supplement), pp 29-32.

the rape-shield statute and our court rules,[12] the careful resolution of such questions would appear to require the presentation of a case where a conflict actually appears. There was no indication of this in *Adair*, and, hence, no call for us to entertain such a question. This Court has long addressed only those issues properly before it, and the defendants' attempts to view such restraint as indicative of a particular view on the merits of a question not addressed are ill-grounded.

D

It is equally true, however, that we must be mindful of the fact that separation of powers requires not only that we dutifully guard against an encroachment on the powers granted to this Court, but also requires, with equal and compelling force, that we dutifully respect those powers granted to the other branches of government and abstain from any exercise thereof. It is this delicate balance that has led us to respect, to every extent possible, the enactments of the other branches, and, where reasonably and realistically possible, to find no conflict should such an interpretation be possible. Accordingly, we have, where possible, read enactments of the Legislature that presented a potential conflict with our court rules in a fashion that would allow both provisions to exist in harmony. See *People v Robinson*, 386 Mich 551; 194 NW2d 709

---

[12] Questions regarding this are not new. While a majority in *Hackett* thought MRE 404(a)(3) was a parallel to the relevant aspects of the rape-shield statute, Justice KAVANAGH went on, in concurrence, to argue that the rule represented "a more sophisticated approach," *id.* at 364, and superseded the statute.

(1972), *People v Mateo*, 453 Mich 203; 551 NW2d 891 (1996).

Where it can be said that there is no inherent conflict between the legislative enactment and the judiciary's rule, "[w]e are not required to decide whether [the] statute is a legislative attempt to supplant the Court's authority." *Mateo* at 211. "We do not lightly presume that the Legislature intended a conflict, calling into question this Court's authority to control practice and procedure in the courts." *People v Dobben*, 440 Mich 679, 697, n 22; 488 NW2d 726 (1992). Mindful of these constraints, I proceed to the cases at hand.

## II

### *McDOUGALL*

#### A

This case arrives before us in a somewhat unique fashion. While, as noted throughout this opinion, questions of conflict between statutes and court rules appear before us from time to time, the genesis of this conflict is unusual. Previously, we generally have been presented with questions of conflict where a court rule was alleged to be in conflict with some statute that existed before its enactment. On other occasions, such as *Berman, supra*, it would appear that such conflict was inadvertent in nature, with the conflict itself appearing only when the provisions actually interacted in the course of a dispute. Here, however, we find the Legislature enacted § 2169 fully mindful and very much intending that it would often compel different conclusions than the court rule

when applied to factual situations. As was noted below in dissent, and now by the majority, the legislative history available in this matter clearly indicates that the Legislature wished to limit the testimony of those it perceived as "professional witnesses."[13] Without disputing the potential difficulties such witnesses might present, it is nonetheless clear that the Legislature was well aware of MRE 702 and endeavored to craft a rule that would serve as a "higher bar" to be cleared before an expert's testimony would be admitted.

Indeed, the very problem at issue today was also presented to the Legislature. In the report of the House Legislative Analysis Section on HB 5169, pp 2-3, issued November 20, 1985, under the section entitled "Arguments Against," it was stated:

---

[13]  "As a practical matter, in many courts merely a license to practice medicine is needed to become a medical expert on an issue.

"This has given rise to a group of national professional witnesses who travel the country routinely testifying for plaintiffs in malpractice actions. These 'hired guns' advertise extensively in professional journals and compete fiercely with each other for the expert witness business. For many, testifying is a full-time occupation and they rarely actually engage in the practice of medicine. There is a perception that these so-called expert witnesses will testify to whatever someone pays them to testify about.

"This proposal is designed to make sure that expert witnesses actually practice or teach medicine. In other words, to make sure that experts will have firsthand practical expertise in the subject matter about which they are testifying. In particular, with the malpractice crisis facing high-risk specialists, such as neurosurgeons, orthopedic surgeons and ob/gyns, this reform is necessary to insure that in malpractice suits against specialists the expert witnesses actually practice in the same speciality. This will protect the integrity of our judicial system by requiring real experts instead of 'hired guns.' " [218 Mich App 501, 509, n 1; 554 NW2d 56 (1996) (Taylor, P.J., dissenting), quoting *Report of the Senate Select Committee on Civil Justice Reform*, issued September 26, 1995.]

The determination of the qualifications of witnesses in trial court proceedings falls within the exclusive jurisdiction of the courts and may not be invaded by the legislature. The Michigan Court Rules already require that an expert be qualified before he or she may testify, and it is always within the court's discretion to disqualify a witness. [*Id.* at 3.]

In such a case, given the clear intent of the Legislature, and its awareness of the conflict, our reluctance to find a conflict and desire to, as much as possible, respect the enactments of our coequal branch, must face the reality of a conflict apparent in both intent and the facts before us.

The trial court ruled Dr. Robia was disqualified under § 2169, and yet also ruled, that, should § 2169 be held invalid, the very same witness, offering the same deposition testimony, in the same case, would be qualified under MRE 702. By way of the practice requirements of the statute, Dr. Robia is unqualified to testify, if it controls. The trial court found, however, that he was nonetheless qualified under MRE 702, and thus he possessed "recognized scientific, technical, or other specialized knowledge" by virtue of his "knowledge, skill, experience, training, or education" to be able to assist the trier of fact in understanding the evidence.

Moreover, while, at times, we have been able to find a statute to amount to no more than a restatement, in different form, of a court rule or rules, i.e., *Mateo*, it is important that the entire thrust of this rule is *exclusionary* in nature. Section 2169 does not offer additional means to interpret or apply MRE 702, but rather offers an entirely additional test. As can be seen in the case of Dr. Robia, a trial court could well

find MRE 702 to be complied with, and yet § 2169 to
still preclude the testimony. Rather than offering an
alternate means for a court to determine a witness'
competency, § 2169 in reality offers only an additional
test to preclude a witness from offering testimony.[14]
In doing so, it impinges on the discretion of the Court
under MRE 702.

Finally, that there is a conflict is so precisely
because, as noted above, the statute was drafted to
accomplish this purpose. As was noted in the dissent
below,[15] the Legislature became unsatisfied with the
manner in which some courts were exercising their
discretion regarding expert testimony, and enacted a
statute designed to limit such discretion. In accom-
plishing such intent, the wording of the statute was
successful, and belies the attempts by defendant to
now suggest that it is but an aid to such discretion.
There can be no evasion of a conflict in this case, and
thus I agree with the majority on this point.

B

When confronted with a conflict between a court
rule and a statute, the invariable question is which
should control. As we have stated, the nearly invaria-
ble rule (until today), required by the doctrine of sep-

---

[14] While one could say that a witness could be qualified under § 2169 to
offer testimony, and, thus, it offers an alternate route for testimony to be
admitted, it would be difficult indeed to imagine a witness who could be
qualified under § 2169 and yet be found unqualified under MRE 702. To
the extent, however, that the Legislature's intent was to limit the testi-
mony of so-called "expert" witnesses where such testimony clearly
deserves no credence, it is within the discretion of the court to do so,
under MRE 702, despite any qualification under § 2169.

[15] See note 13. See also House Legislative Analysis Section on HB 5169,
issued November 20, 1985.

aration of powers is that the judiciary's rule, properly enacted within its own domain, must prevail.[16] We are not, however, in the course of such decisions, unique in addressing this issue. Our state's current constitution is of sufficiently recent vintage that there exists an extensive history regarding its enactment. Included is the precise conflict we see today, and its resolution is compelling evidence of the course we should follow.

In the course of the constitutional convention, there was debate over what would become Const 1963, art 6, § 5. The majority view was quoted above. There was, however, an unsuccessful attempt, offered by three members of the Committee on the Judicial Branch,[17] that, if enacted, would have specifically approved of both the Legislature's action in enacting § 2169 and a decision in favor of its validity. The proposed language (the "Donnelly/Leibrand/McAllister amendment") was as follows:

> The supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts in the state, *it being provided that where there is a conflict between supreme court rule and a statute concerning evidence or substantive law the statute shall prevail.* [1 Official Record, Constitutional Convention 1961, p 1289 (the emphasized language was not adopted in the final document).]

Clearly, were such language adopted, it would have amounted to an express endorsement of the result sought by defendants. The result, however, after

---

[16] See, e.g., *Berman; In re Koss Estate, supra.*

[17] The members offering the amendment were Ann E. Donnelly, Karl K. Leibrand, and Thomas R. McAllister. 1 Official Record, Constitutional Convention 1961, p 1289.

debate,[18] was that the proposed amendment was soundly defeated, 75-32. *Id.*, p 1294. The drafters of our constitution squarely considered whether the Legislature should be allowed to intrude upon this Court's power to determine rules of evidence. They answered the question with a resounding "no," and the constitution that resulted from their efforts permits no such thing. My conclusion today merely echoes their determination. In doing so, I would hold that MCL 600.2169; MSA 27A.2169 unconstitutionally invades the province of the judiciary, and thus must be declared invalid.

C

It was argued below, however, and now is accepted by the majority today, that this statute addresses a substantive, as opposed to procedural, concern, and, thus, it is within the domain of the Legislature in any event, with citation below to *Smith v Smith*, 433 Mich 606; 447 NW2d 715 (1989).[19] While, as noted below, that case lacked a majority opinion, there is no dispute of the basic proposition for which it was apparently cited, that the Legislature alone controls substantive law making. See note 18. The actual dispute in *Smith* centered on the interaction of two statutes: MCL 552.17a; MSA 25.97(1), as it then existed,

---

[18] The debate centered on rules of evidence, there being no dispute that the powers of the Supreme Court did not (and do not) extend to making substantive law. 1 Official Record, Constitutional Convention 1961, pp 1291-1293. As will be discussed, the majority is led astray by the certainty of the last principle, one to which I do not offer dispute.

[19] No opinion in *Smith* garnered a majority. Chief Justice RILEY authored the lead opinion, joined by Justice GRIFFIN. Justice ARCHER wrote separately, but "fully join[ed]" in the majority's holding and reasoning. 433 Mich 640. Justice BOYLE also wrote separately in concurrence. This author, joined by Justice BRICKLEY, dissented, as did Justice LEVIN.

and the Age of Majority Act. While there was little common ground with respect to rationale, the Court was unanimous in urging the Legislature to revisit the statutes at issue.[20]

Relevant to the question before us today, the *Smith* majority's decision resulted in a reading of the statutes that conflicted with MCR 3.209(B)(1)(b) as it then existed. Chief Justice Riley's opinion offered several rationales for why this was correct, but the primary focus rested on the view that the statutes in question, one that defined the age of majority in this state, and the other that provided for child support for minors, were substantive in nature, and thus the Legislature's determination would control. Justice Boyle's opinion did not address this issue, confining itself to statutory construction.

The argument then goes, as offered both in dissent below, and by the majority today, that the statutes herein amount to substantive law determinations and are thus within the province of the Legislature. As noted, there is no dispute that, were the antecedent true, the logic of the analysis would follow.[21] Without

---

[20] It appears the Legislature heeded this request shortly thereafter in making substantial changes to MCL 722.3; MSA 25.244(3) and adopting MCL 722.3a; MSA 25.244(3a).

[21] While the majority focuses a fair amount of effort on this point, I offer no disagreement. The difference between our approaches does not arise from any effort of mine to intrude upon the Legislature's domain, but rather from my refusal to allow the Legislature to intrude upon the judiciary's province. The majority's view effectively allows the Legislature to determine, at its will, what might be substantive, and thus, when it is inclined, to override a judiciary decision with its own preferences. While the majority, or at least the dissent below, would likely attack my view as "antimajoritarian," its own view is deficient in failing to recognize that the branches of government are in fact coequal, by establishing what amounts to an undefined trump card for the Legislature to hold. I have no doubt the Legislature prevails when the suit to be followed is substantive. The majority's approach, however, is so ill-defined as to allow the Legislature to change its cards as it sees fit.

reaching the various positions advanced by Chief Justice RILEY's *Smith* opinion, I am compelled to reject this argument because it is apparent that the necessary prerequisite for such concerns, that the rule be one of substantive law, is not present in this case.

It was offered in dissent below that because the statute herein "constitutes a substantive change in a statutory cause of action that originated from the common law, which the Legislature is authorized to effect, it takes precedence over MRE 702. *Smith, supra.*"[22] I disagree. While the statute at issue represented a departure in the practice of courts as it relates to medical malpractice actions, it does not represent a substantive change in the cause of action. Rather than changing, adding, or eliminating elements of a cause of action (any of which might amount to a substantive change), the statute merely imposes conditions on expert testimony. Indeed, what the statute does, as discussed above, is usurp the province of a rule of evidence. The fact that this statute may serve to make it substantially more difficult, practically speaking, to bring a medical malpractice action does nothing to alter the substance of such an action.

It has long been held (again, no more so as of today) that " '[t]he judicial function constitutionally empowers the courts to make their own rules of procedure, including rules of evidence . . . .' " *Perin,* 373 Mich 541 (emphasis deleted).[23] A primary theme

---

[22] *McDougall v Eliuk,* 218 Mich App 519 (TAYLOR, P.J., dissenting).

[23] See also *People v Jackson,* 391 Mich 323, 336; 217 NW2d 22 (1974), where the Court, in the course of adopting a rule that retained a trial judge's discretion on an evidentiary impeachment issue in the face of a statute that arguably removed such discretion, noted:

> In so construing our statute we have in mind that it is the duty of this Court to make the ultimate decision on whether to adopt, amend or retain a rule of evidence.

both of the majority here and in the dissent below was that the Legislature is better equipped to undertake a deliberative approach to making policy decisions. While that is certainly correct (and indeed, likely beyond debate) regarding substantive determinations of law, this view fails to acknowledge that policy decisions also play a role in the evidentiary rules of this Court, and that this Court is not only the best equipped province for such rule making, but also the constitutionally recognized one. As we noted in the course of discussing due process concerns (hence the constitutional reference), "Policy, not constitutional limitations, underlies most of Michigan's evidentiary code, and the determination of that policy has been explicitly left to this Court by art 6, § 5, of the 1963 Constitution." *People v Allen*, 429 Mich 558, 573, n 10; 420 NW2d 499 (1988). Accordingly, this argument falters, as where the statute addresses only a rule of evidence, by its very nature procedural, the halting of such an intrusion would take nothing away from the proper domain of the Legislature.

D

The majority, rather than examining *Smith*, seems content to merely attack *Perin* as ill-grounded.[24]

---

[24] Given that such an attack is necessary for the majority's decision, it will prove fatal for *Perin*, regardless of the ill-grounded nature of the assault. The majority's rationale for the destruction of *Perin* is that we now realize that substantive law is the domain of the Legislature, whereas *Perin* did not. I submit that such a realization did not first occur in July 1999, or 1982, or even 1963. Indeed, as noted in the text of this opinion, that truly was beyond (and not even a subject of) debate at our last constitutional convention. What is quite novel, however, is a suggestion that none before has been aware of this. Recall the limiting words of the supposedly overbroad *Perin*, brushed over by the majority in its haste to out the spot it leaves on its effort to expose the judiciary's impartiality to the Legislature's control:

While the majority would chastise *Perin* for its cita-
tion of Wigmore, the majority's citation of a Court of
Appeals opinion of recent vintage and identical
authorship as the majority opinion is hardly more per-
suasive. The remainder of the authority offered for
the proposition advanced is a 1957 law review article
and dicta offered by Justice Wɪʟʟɪᴀᴍs in *Kirby v Lar-
son*, 400 Mich 585, 598; 256 NW2d 400 (1977), in a
portion of his opinion that failed to garner the alle-
giance of a majority of the Court. While certainly not
disputing the esteem of the latter author, I fear the
majority has misconstrued both Justice Wɪʟʟɪᴀᴍs'
words and his meaning.

While the *Kirby* Court decided the case on very
distinct grounds, Justice Wɪʟʟɪᴀᴍs offered a considera-
bly broader opinion, joined only by two other jus-
tices, suggesting, inter alia, that a statute prohibiting
the admission of evidence of a conviction for viola-
tion of the motor vehicle code (or similar local ordi-
nances) in any civil action was invalid as being con-

---

"The judicial function constitutionally empowers the courts to
make their own rules of procedure, including rules of evidence
(*subject only to specific constitutional limitations*)." [*Perin* at 541
(emphasis added).]

What then was the Court speaking of in its citation of constitutional limi-
tations, but the very prohibition of substantive lawmaking unquestionably
endorsed by the delegates of our last constitutional convention (and rec-
ognized by this Court and many others long before)? And yet today we
see the majority reveling in this limitation as though it is both a basis for
its decision and a revelation to the rest of the world, that somehow
strayed from the path of light. There is a tendency among those who walk
under a standard espousing such views to attribute every past decision
with which they disagree to a failure to share their enlightenment, and,
equally, a zeal evidenced to, with much dispatch, overrule all such prior
decisions as simply wrong. The debate is not so simple, nor those who
came before us so unenlightened, as we are led to believe by the majority
herein.

tradictory to GCR 1963, 607. In the course of this discussion, Justice Wɪʟʟɪᴀᴍs wrote:

> Thus, since admissibility of a traffic ticket is an evidentiary question, the court rule supersedes the statute. As suggested in 3 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 404, "Because no clear legislative policy reflecting considerations other than judicial dispatch of litigation can be identified,[7] section 731 should be construed simply as a statutory rule of practice, validly superseded by Rule 607 to the extent applicable."

---

[7] Honigman & Hawkins suggest that two possible policies underlie the rule, one that such convictions are not credible evidence or are unduly prejudicial, and the other that the policy is to encourage guilty pleas in traffic courts. However, since, as drafted, the statute relates only to the admissibility of evidence, a subject clearly more within the rule-making competence of the courts, the rule should supersede the statute where the two conflict. 3 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 404.

---

[400 Mich 598.]

Thus, viewing the entire text of this discussion, several things can be seen. First, of course, this discussion had its genesis in the commercial annotations offered to the court rules of the time by the authors noted. Second, while speaking of the inability to identify policy considerations other than judicial dispatch, the annotation authors themselves identified two distinct potential, albeit "not clear," policy considerations, one the majority today would likely argue could be within the legislative realm.[25] Third, and most

---

[25] Nor is it difficult to think of other policy considerations that might foster such a statute. For example, the practice of most of our state's police agencies is that, generally speaking, following a motor vehicle accident, the party at fault is cited for some motor vehicle violation, either one explicitly apparent (i.e., failing to yield) or one more general, on what might almost amount to a res ipsa loquitur theory (i.e., violation of the

importantly, the phrase "[w]e conclude that a statutory rule of evidence violates Const 1963, art 6, § 5 *only when*" (*ante* at 30 [emphasis added]) appears nowhere in *Kirby*, nor in the sources from which the quotation in *Kirby* was derived. Rather, the majority has taken a justification offered in plurality dicta and rearranged it so that now, says the majority, the reverse is true.

In *Kirby*, Justice WILLIAMS suggested that no legislative policy other than judicial dispatch could be found to support the statute, even though he himself then, in footnote 7, cited Honigman & Hawkins as suggesting two such rationales. What the majority says today, however, stands that quotation on its head: "only when ' "no clear legislative policy reflecting considerations other than judicial dispatch of litigation can be identified" ' " (*ante* at 30) will we find a statute to be unconstitutional. So, if a statute and a court rule conflict, and the matter is one concerning solely judicial dispatch of litigation, then the court rule must control. But if the statute has as its rationale a policy choice regarding anything other than

basic speed law). Such citations have many purposes: sanctioning the at-fault driver, giving the Secretary of State, by means of the point system, a means to track drivers who repeatedly cause problems, raising revenue for local municipalities, and, ultimately, increasing the insurance rates of drivers at fault (which can be justified as the highest cost drivers paying the highest rates or derided as a double penalty for such drivers, in view of the fact the accident itself might have already affected such rates). Any one of these justifications might prompt the Legislature to desire to enter the field of evidentiary rules and preclude evidence of such citations from civil cases, lest officers be concerned with civil consequences and defer issuing citations in marginal situations. The majority, while purporting to derive authority from the *Kirby* dicta, ignores the fact that the question addressed by such dicta would be decided differently under the majority's decision today.

judicial dispatch,[26] the majority holds that it reflects a decision of substantive law, rather than practice and procedure, and thus the statute prevails, the Legislature being the better policy forum.[27]

So we must wonder exactly how many of our court rules deal with items that might evoke considerations other than judicial dispatch, and thus be subject to alteration on the basis of those considerations, evidencing decisions of "substantive" law by the Legislature. As a starting point, it is worth recalling that judicial dispatch is generally taken to be somewhat synonymous with judicial efficiency. Presuming a definition of judicial unnecessary in this context, we find that the word dispatch refers, again in this context, to the prompt or speedy transaction or disposal of matters:

---

[26] Yet again, I must reiterate, that it is here, and exactly here, that the majority's analysis unravels and I must disagree. I do not suggest for a moment that the Legislature's powers fail it in matters of substantive law, nor that this Court's powers extend so far. What I dispute, however, is the myopic suggestion that "substantive" law includes any regulation of court practice and procedure related to matters other than judicial efficiency. Such a view subordinates the judiciary to the regulation of the Legislature in the conduct of its judicial function. Under the majority's view, the Legislature would appear free to control any aspect of the judicial function it wishes, save perhaps the scheduling of dockets. To the extent this might not be so, it will be not because of adherence to the test articulated by the majority, but rather, as the majority admits in its conclusion, that this Court will be the final arbitrator of such issues, and thus will remain able to one day, in the face of a legislative enactment less to its liking, undo what has been done today. While such a view might comfort those concerned with the majority's action today, it shows little respect for either our constitutional structure or the supposed finality of this Court's decisions, the latter aspect, it seems, being increasingly endangered in its own right.

[27] The majority, in discussing policy considerations as being best left to the Legislature, ignores our own holding in *Allen, supra,* that policy considerations underlie most of the evidentiary code and that such determinations are constitutionally left (yet again, until today) to this Court.

> Dispatch (di spach') *v.t.* 1. to send off or away with speed, as a messenger, telegram, body of troops, etc. 2. to dismiss (a person), *as after an audience.* 3. *to put to death;* kill: *The spy was promptly dispatched.* 4. to transact or dispose of (a matter) promptly or speedily. —*v.i.* 5. *Archaic.* to hasten; be quick. —*n.* 6. the sending off of a messenger, letter, etc., to a destination. 7. the act of putting to death; killing; execution. *8. prompt or speedy transaction, as of business.* 9. expeditious performance; promptness, or speed: *Proceed with all possible dispatch.* 10. *Com.* a. a method of effecting a speedy delivery of goods, money, etc. b. a conveyance or organization for the expeditious transmission of goods, money, etc. [*The Random House Dictionary of the English Language, Second Edition Unabridged,* p 567 (emphasis added).][28]

So, then, the majority offers us a rule today that says, where matters of judicial efficiency alone are at hand, the judiciary is supreme. However, where other concerns might arise, and might implicate policy decisions that the majority has, by focusing solely on the Legislature's abilities in such regard (and ignoring the proper place of such concerns in our own regulation of judicial matters), left now solely to the Legislature, it must be "substantive," and our court rules will suffice only until the Legislature speaks, at which time, the rules must yield.

Thus, if this is to be the rule, we should consider exactly what of our court rules might deal solely with concerns of judicial dispatch, and thus be insulated from legislative intrusion, and which might reflect those policy considerations that the majority now finds, even within the context of regulating our own,

---

[28] For a definition concurrent with the time Justice WILLIAMS authored *Kirby,* see *Webster's Third New International Dictionary of the English Language, Unabridged,* p 653, "dispatch . . . 3a: to dispose of rapidly or efficiently (as a piece of business) : execute quickly . . . ."

until now, coequal branch of government, the judiciary incompetent to undertake. Is a rule that precludes relevant evidence on the grounds of unfair prejudice concerned solely with judicial efficiency, or might it reflect a policy judgment, best made elsewhere, that some evidence, though relevant, is likely to have an undue effect on the outcome of a trial? MRE 403. Are rules limiting the admissibility of character evidence merely rules ensuring efficiency at trial, or do they reflect a policy decision that character is not probative of conduct? MRE 404, 405. Is a rule that bans introduction of subsequent remedial measures merely a tool of judicial efficiency, or does it reflect a policy judgment that the Court will not penalize those who attempt to repair harmful situations by allowing evidence of such remedies? MRE 407.[29] Are rules addressing the admissibility of statements made in the course of compromise, payment of medical expenses, and plea negotiations merely tools to speedily move along the judicial forum, or do they reflect substantive policy decisions regarding the advisability of encouraging such discussions? MRE 408-410. What about a rule prohibiting discussion of the presence of liability insurance? MRE 411. What of requirements as to who may be a witness? MRE 601-607. Impeachment by evidence of conviction of a crime? MRE 609. Recall as well that the viability of the *Kirby* plurality's discussion regarding such matters is now seriously in question following the major-

---

[29] I will depart from the general format of this section, which is to offer an outline of those questions that the Legislature may now choose, at its whim, to discuss in terms of "policy" and "substantive law," and alter our court rules to note that MRE 407 appears to be an excellent example of how policy considerations have properly come into play in the course of the Court regulating the judicial function.

ity's opinion. Is there a substantive policy question about when court-appointed experts are required, or how they should be compensated? MRE 706. And in MRE 803, alone, do we find literally dozens of policy judgments regarding the veracity of various items, many of which the Legislature might have an interest in addressing (i.e., public records, prior convictions, documents affecting an interest in property, vital statistics, statements made for the purposes of medical treatment . . .)?

The point of this discussion is not to invite the Legislature to discover that the majority has knocked down the fence that has separated our branches until this day, nor to invite it to graze upon those of our court rules it wishes to modify. The effect of the majority's decision, however, is to invite the Legislature to trample whatever rules of the judiciary might arguably concern something other than judicial efficiency, and the majority's decision herein offers so little to support its conclusion that the matter discussed today is substantive that it invites legislative "questions" far more fanciful than the ones above.

Recall again what it is that the majority finds persuasive in holding that the instant matter is substantive. Consider:

Applying the substance/procedure analysis set forth above, we conclude that § 2169 is an enactment of substantive law. It reflects wide-ranging and substantial policy considerations relating to medical malpractice actions against specialists. We agree with the Court of Appeals dissent in *McDougall* that the statute

"reflects a careful legislative balancing of policy considerations about the importance of the medical profession to the people of Michigan, the economic viability of medical spe-

cialists, the social costs of 'defensive medicine,' the availa-
bility and affordability of medical care and health insur-
ance, the allocation of risks, the costs of malpractice insur-
ance, and manifold other factors, including, no doubt,
political factors—all matters well beyond the competence
of the judiciary to reevaluate as justiciable issues. [218 Mich
App 518 (TAYLOR, P.J., dissenting).]"

Clearly then, the statute does not involve the mere dispatch
of judicial business. [*Ante* at 35.]

Therein, we see the key to the majority's decision, a
key that flings open the door that has previously sep-
arated our branches of government. All the Legisla-
ture need do is determine some questions outside the
"mere dispatch of judicial business," and the Court's
own regulation of its own judicial function may be
cast aside. As demonstrated above, many, perhaps
most, of our court rules are susceptible to questions
being found under as flexible and one-sided a "test"
as the majority gives us today.

Very shortly after he authored the *Kirby* decision
and dicta, Justice WILLIAMS joined a unanimous Court
in taking the most unusual action of addressing the
legislative and executive branches sua sponte regard-
ing another attempted legislative encroachment on
the judicial branch's domain, the Open Meetings Act:

Const 1963, art 3, § 2 divides the powers of government
among three branches and commits to each branch exclu-
sive exercise of the functions properly belonging to it,
except as otherwise expressly provided in the Constitution.
This separation of powers is designed to preserve the inde-
pendence of the three branches of government.

Art 6, § 1 vests the judicial power of the state exclusively
in one court of justice. Section 4 of that article vests gen-
eral superintending control over all courts in the state in
the Supreme Court and § 5 confers upon this Court the

power to make rules to govern the practice and procedure within the courts. It is also well settled that under our form of government the Constitution confers on the judicial department all the authority necessary to exercise its powers as a coordinate branch of government. . . .

The judicial powers derived from the Constitution include rulemaking, supervisory and other administrative powers as well as traditional adjudicative ones. They have been exclusively entrusted to the judiciary by the Constitution and may not be diminished, exercised by, nor interfered with by the other branches of government without constitutional authorization. . . . It is our opinion that 1976 PA 267 is an impermissible intrusion into the most basic day-to-day exercise of the constitutionally derived judicial powers. [*In re 1976 PA 267*, 400 Mich 660, 662-663; 255 NW2d 635 (1977).]

The logic, constitutional support, and underlying premise of a government of checks and balances, all these things from which this decision arose, remain true today. Less true, however, is the majority's recognition of them. One must wonder how a question such as one raised by *In re 1976 PA 267* would be resolved under the majority's analysis today. While it would appear that the question of open versus closed deliberative processes would have a marked effect on judicial efficiency, one would be hard-pressed indeed to argue that the policy concerns underlying the Legislature's enactment of the OMA had anything at all to do with judicial dispatch. Thus, it would seem that, under the majority's rationale, *In re 1976 PA 267* should be decided differently. And yet, consider *Federated Publications, Inc v Michigan State Univ Bd of Trustees*, 460 Mich 75; 594 NW2d 491 (1999). Would the majority afford to constitutional universities more protection than a coequal branch of government? Doubtful indeed, particularly when the majority's reference to *In re 1976 PA 267* in this recent case is

recalled. This is the schizophrenia the majority's decision today represents. What is substantive is either (1) whatever the Legislature says is substantive, or (2) whatever the majority says is substantive, with the two alternatives likely becoming opposed the next time the majority of this Court and the Legislature come to part ideological company. I would rest the decision today on firmer ground than the quicksand the majority constructs, given that it is likely to swallow up a great many of our Court's controls on our judicial branch, unless, of course, the majority is willing to engage in a cynical effort to control the shifting of such sand to its pleasure.[30]

E

It may be asked then, given the Legislature's obvious intent and deliberation on this matter, why we should not acquiesce to its wishes, as contemplated

---

[30] Likewise, the majority's approving reference to the contention of the dissent below that the Legislature, being empowered to create or eliminate a cause of action, is certainly free to modify such action as it sees fit, including enacting the limitations herein. It is true only to the extent such modifications are permitted by our constitution. Were the Legislature to modify a cause of action, such as medical malpractice, in such a way as to be obviously violative of equal protection (for example, by recognizing a claim only in claimants of a particular gender), we would have no difficulty saying such a modification was constitutionally void. This contention from the dissent below, accepted by the majority, is meaningless to a question whether the action of the Legislature is constitutionally permissible, and supports the majority's position only to the extent that one has already decided (or presumed) that the Legislature's action is constitutional. Considering that it is that latter question that is before us, it is of no help to say that "the Legislature could do this (if only it constitutionally can)"? My difficulty with the predicate causes me to disagree with the contention as it is offered herein, and the contention's requirement of the antecedent of constitutionality requires that it be discarded from the debate in any event.

in *Perin*.[31] While the focus of defendant's presentations here have not been primarily directed, other than a few references at oral argument, toward this end, the question itself is nonetheless legitimate. I must conclude, however, that it should be answered in the negative.[32]

Now and again, the Court may endeavor to "rebalance" its scales when an ill-advised trend appears.[33] No information has been presented to convince us that such dark clouds appear on the horizon. While counsel pointed to specific instances of very questionable "expert" testimony, the trial court, as always, retains discretion to prohibit such testimony, and such decisions remain reviewable on appeal in the usual fashion. Indeed, in the two years since the Court of Appeals issued its decision in this case,

[31] Indeed, that might not be asked only by those who disagree with my view, but equally by those who would prefer to reach the result of the majority without creating the breeches in the wall of separation between our branches of government the majority's effort leaves behind.

[32] It could also be argued that by adopting MCR 2.112(L), the Court silently deferred to the statute. This rule adopts the affidavit of merit required by MCL 600.2912d-600.2912e; MSA 27A.2912(4)-27A.2912(5). That section does incorporate a reference to § 2169, requiring the affidavit to be signed by an expert reasonably believed to meet the qualifications of § 2169. The court rule, however, reflects only a reference to the affidavit of merit as required by that section, along with addressing service of the affidavit. To the extent the court rule references sections 2912d and 2912e, it would, on its face, appear to be an acquiescence, with modifications, of those subsections. To the extent those subsections themselves reference § 2169, it would be a strained reading indeed to consider that to amount to a constitutional analysis, thoughtful deliberation, and agreement with § 2169. Rather it would seem appropriate to read the rule as an endorsement of the concept of an affidavit of merit, and a requirement for same, and require that the expert offering the affidavit be qualified as envisioned by this opinion.

[33] Indeed, our adoption of MCR 2.112(L), discussed in note 32, could be seen as a measure to require clearly defined, and at least arguably meritorious, positions to be stated by parties before extensive litigation being undertaken.

neither the judicial nor healthcare systems have demonstrated any ill effects, and, in view of the limited life span of this statute and recall of practices as they existed before its enactment, none would seem to be expected.

Furthermore, while the statute seems too ill-balanced to be adopted as a rule, it also can be seen, both from the instant cases and hypothetical situations, to be lacking in the relevance of its criteria to its result. Certainly, for expert witnesses to be of help to a court, they must be well-informed in their subject area, or, in common parlance, qualified. The statute's requirements, growing more stringent with the 1993 amendments, have taken this laudable goal to an extreme that would often frustrate its purpose.

Recall that, as it now exists, the statute requires a specialist for specialist "match-up" between witnesses and defendants. It would seem that under this rule, were a defendant practicing medicine outside his specialty area (which might well be a factor in the underlying claim) when malpractice was alleged, the statute would seem to require, nonetheless, a witness in his specialty, as opposed to one who specializes in the area he was practicing in. The result of the statute would seem to favor having a witness as *un*qualified as the defendant in such cases. As can be seen in the facts of *Sobran*, the lines between various medical specialties are often not the most well-defined.

Such concerns aside, the statute fails to recognize many of the avenues by which an expert might come to have knowledge of the subject at hand, and gives undue credence to other considerations. Moreover, it limits itself to only medical and dental malpractice actions. To the extent this Court might wish to re-

examine MRE 702 as it relates to qualification of experts, and the need for this has not been shown, we would also, one would expect, require cause to arbitrarily limit such considerations to only a certain type of case or class of defendants. Once again, the Court's paramount role must be that of a neutral arbiter, and defendants have offered no reason why the Court should adopt a particular rule limited solely to those similarly situated to themselves.[34]

---

[34] I must pause once again, as the majority, in its haste to impugn, has lost track of the context. It is suggested that the above reflects some sort of dissatisfaction with the Legislature's determination, in ignorance of the extensive record underlying the Legislature's choice. *Ante* at 35, n 19. This is not offered as a criticism of the Legislature's efforts, but rather as analysis, required under *Perin* (which I would heed rather than vanquish) of whether this Court, under its rule-making authority (which I obviously view to encompass the constitutional range of "practice and procedure," rather than the majority's newly created span of "judicial dispatch") should acquiesce to the Legislature's determination. In this case, I would not, on the basis of my analysis of the interworkings of such a framework, rather than some anecdotal evidence.

In regard to the presence of such evidence, I can only raise an eyebrow at the majority's citation of the legislative record, which would seem to be something of a doctrinal departure in citing a source which those in the majority usually view with considerable disdain. See, e.g., *Hagerman v Gencorp Automotive*, 457 Mich 720, 761, n 14; 579 NW2d 347 (1998) (TAYLOR, J., dissenting). While I certainly acknowledge the presence of such a history, I suggest that this Court should not, on the basis of what is offered therein, be persuaded to acquiesce in the rule the Legislature established. Whether such history was (obviously) or should have been (a matter for academics, not the Court) sufficient to move the Legislature is not the question. Rather, the question is whether the Legislature, regardless of how great the motivation, may intrude on the constitutional province of the judiciary. In answering the *Perin* question of acquiescence, I must examine the Legislature's motivations, but in answering the former question of constitutional intrusion, I, in contrast to the majority, would not consider the merits of such motivations at all, reviewing them only as much as is necessary to determine whether the intent to overrun a constitutional boundary was present. The barrier established in Const 1963, art 6, § 5, does not, anywhere on its face or in its import, include an exception for "good intentions."

F

In view of the trial court's ruling on MRE 702, and in light of my analysis herein, it is clear that summary disposition was improperly granted in *McDougall*. I would note, however, that it is not entirely clear whether the trial court intended to rule that Dr. Robia was qualified under MRE 702, or, alternatively, intended to reserve its final ruling on that question. Thus, a remand to the trial court would appear necessary so that it might clarify its decision under MRE 702, and, if necessary, undertake further proceedings.[35] Accordingly, I would affirm the decision of the Court of Appeals in that case and remand the matter to the Wayne Circuit Court for further proceedings.[36]

III

*SOBRAN*

The Court of Appeals ruled in *Sobran* that Dr. Caminker was unqualified under MRE 702. This mat-

[35] I note also that the trial court's granting of summary disposition was based on its refusal to allow plaintiff additional time to produce another expert witness following its exclusion of Dr. Robia. On remand, if the trial court found that it had not yet ruled on the admissibility of Dr. Robia's testimony under MRE 702, it would be free to consider the matter in light of the criteria under MRE 702, taking note of any of the various arguments offered by defendants and plaintiff regarding his qualifications that it might find helpful to this decision. Likewise, the plaintiff should be free, on remand, to offer an alternative expert whose qualifications might be subject to less question than are Dr. Robia's.

[36] Both the cases we consider today present us with the 1986 version of the statute. It naturally follows, however, that my analysis herein must apply with equal force to this statute as it currently exists after the 1993 amendments. Given that the amendments resulted in an even more restrictive, and therefore intrusive, version of the statute, there is no doubt that such a statute is also a constitutionally impermissible intrusion into this Court's powers, and thus should be invalid as well.

ter was not passed on by the trial court, or argued by the parties in the Court of Appeals. The trial court based its grant of summary disposition for defendant on § 2169. As can be seen above, a grant of summary disposition based on that statute cannot stand under my analysis. Thus, I would turn to the MRE 702 basis found by the Court of Appeals.

Unlike the Court below, this Court has had the benefit of briefing and argument by the parties on the issue of Dr. Caminker's qualifications under MRE 702. Nonetheless, the trial court was never presented with the opportunity to determine whether the matter was, as construed by the Court of Appeals, a surgical malpractice case or, rather, as argued by the plaintiff, a failure-to-diagnose case. Clearly, different types of experts and different standards of care may apply in each situation. The trial court's entire analysis was further improperly constrained by § 2169. Accordingly, it would be appropriate to remand the matter to the trial court so that it might reconsider its ruling on the admissibility of Dr. Caminker's testimony under MRE 702.

Given that the Court of Appeals lacked the benefit of either a record on this issue or briefing by the parties, I would specifically note that the trial court should not consider itself bound by the decision of the Court of Appeals on the issue of MRE 702, and, likewise, would express no view on the merits of that issue, believing it should be decided by the trial court in the first instance. I would reverse the decision of the Court of Appeals and remand this matter to the trial court for further proceedings.

IV

I would affirm the decision of the Court of Appeals in *McDougall*, and reverse the decision of the Court of Appeals in *Sobran*, remanding both cases to the trial courts for further proceedings. "That this prerogative of the courts includes the power to formulate and to alter the rules of evidence ought not to be doubted." *Perin* at 542.[37] While we have, at least until today, moved cautiously and hesitantly in making these determinations, aware of the coequal dignity of our Legislature, the constitutional basis for the conclusion I reach should not be doubted. In speaking against the Donnelly/Leibrand/McAllister amendment (and thus in favor of the version adopted in our current constitution), Committee on the Judicial Branch Chairman Robert J. Danhof noted the clear distinction that the statute impermissibly crossed: "The Legislature may write statutes as they relate to the substantive law, but the rulemaking power of the court as it relates to the admission of evidence should not be limited, as this would do." 1 Official Record, *supra*, p 1289. The drafters of our current constitution declined to turn against the provisions of every constitution in our state's history and permit the Legislature to impose restraints on the judiciary's power

---

[37] The point of this dissent is not, as the majority suggests, much ado about "turf." Rather, it is necessary to point out what is both a monumental redrawing of the lines that separate our branches of government and a zealous effort to advance a particular philosophy. I must wonder at what must be the underlying precept of such views, that all who have come before were in error, and fidelity to our constitution begins anew today. I have no problem with the latter pledge (and, like all, I would hope, welcome it), but would suggest adherence thereto requires both an understanding and respect for how our constitution has been viewed before. In the place of it, however, it seems we are destined to find but disregard for the previous efforts of this institution.

to determine rules of evidence. I find no reason to permit such action today. The statute, MCL 600.2169; MSA 27A.2169, is an invalid intrusion on the province of this Court, and, in glibly stating that that is not true, the majority abdicates the domain of this Court to the discretion of the Legislature. I can only hope that, at some point, likely as the ideological alignment of the Legislature and the majority of this Court diverge, we will again revisit this issue, and rebuild the historic divide between the courts and the Legislature, which the majority has carelessly toppled today.

KELLY, J., concurred with CAVANAGH, J.