*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MARION LAMONT PERRY, JR.,

Defendant-Appellant.

UNPUBLISHED
October 03, 2024
1:46 PM

No. 361129
Berrien Circuit Court
LC No. 2020-000756-FC

Before: RICK, P.J., and JANSEN and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial conviction of second-degree murder, MCL 750.317. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to 50 to 87 ½ years' imprisonment. We affirm.

## I. FACTUAL BACKGROUND

This action arises from the murder of defendant's girlfriend, 19-year-old Uniqua Jones, on November 30, 2019. At the time, Jones and defendant were staying with Jones's grandmother in her apartment. Jones was shot once in the upper abdomen and died minutes later. Defendant fled the scene before police arrived. After talking with several individuals, Detective Sergeant Steven Morrow of the Benton Harbor Police Department determined that defendant was a prime suspect. The police did not know of defendant's whereabouts, but learned from Jones's mother that defendant might have gone to stay with a cousin in Grand Rapids. With the assistance of the Grand Rapids Police Department, defendant was found and arrested at his cousin's home on December 13, 2019.

Defendant was charged, in part, with first-degree murder.[1] At defendant's first trial, a mistrial was declared when a police officer testified that defendant was on parole when he was

---

[1] Defendant separately pleaded guilty to felon in possession of a firearm (felon-in-possession), MCL 750.224f; and possession of a firearm during the commission of a felony (felony-firearm),

taken into custody. The trial court ruled that double jeopardy did not bar retrial. Defendant's second trial took place in April 2021, while several administrative orders related to the COVID-19 pandemic were still in effect. In conformity with these orders, the trial court closed the courtroom to the public. Defendant's trial was instead livestreamed to the public via Zoom. Defendant did not object to the courtroom closure or the decision to livestream his trial.

At trial, Detective Morrow testified that he interviewed defendant twice, once after his arrest in December 2019, and again in January 2020. During the first interview, defendant told Detective Morrow that Jones was shot outside the apartment and entered the apartment with a gunshot wound. Detective Morrow knew that the account was false on the basis of Jones's autopsy, which indicated that the bullet had severed her spine and paralyzed her, meaning that she could not have walked after she was shot. Detective Morrow confronted defendant with these facts. Defendant then gave a second version of events. He instead asserted that Jones pulled a gun on him during an argument. They struggled over the gun, which discharged and killed Jones. During his January 2020 interview, defendant gave a third separate account of the events leading to the shooting. This time, he again stated that Jones pulled the gun on him. Defendant previously stated that he was face-to-face with Jones when they fought over the gun. However, in the third version of events, he claimed that during the fight, he spun Jones around, grabbed her from behind and then clasped her wrists. Defendant again claimed that the gun went off and killed Jones.

The jury found defendant guilty of second-degree murder and he was sentenced as earlier described. Defendant moved for a new trial and a *Ginther*[2] evidentiary hearing, raising claims of ineffective assistance of counsel. A *Ginther* hearing was held, but the trial court rejected defendant's ineffective assistance claims and declined to grant him a new trial. Defendant thereafter filed a claim of appeal in this Court. He then moved to remand, seeking an evidentiary hearing to develop the record in relation to a claim that his constitutional rights were violated when the prosecutor employed challenges for cause on the basis of jurors having criminal records. This Court denied the motion. *People v Perry*, unpublished order of the Court of Appeals, entered January 9, 2024 (Docket No. 361129). We now address defendant's appeal as of right.

## II. ANALYSIS

### A. PROSECUTORIAL MISCONDUCT

Defendant first argues that the prosecutor committed misconduct[3] by mischaracterizing the law. Defendant specifically takes issue with comments made by the prosecutor indicating that the

---

MCL 750.227b, in order to avoid a jury learning of his criminal record at his murder trial. He was sentenced as a fourth-offense habitual offender to 50 to 76 months' imprisonment for the felon-in-possession conviction, and two years' imprisonment for the felony-firearm conviction.

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] We note that "the phrase 'prosecutorial misconduct' has become a term of art in criminal appeals . . . [but] these claims of error might be better and more fairly presented as claims of 'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' " *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015).

-2-

jury could find him guilty of second-degree murder for knowingly creating a high risk of death by attempting to disarm Jones. He alternatively argues that defense counsel was ineffective for failing to object to these comments. We disagree.

Because defendant did not object to the prosecutor's comments at trial, this claim is unpreserved. *People v Thurmond*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 361302); slip op at 9. Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting defendant's substantial rights. *People v Thomas*, 260 Mich App 450, 453-454; 678 NW2d 631 (2004). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To satisfy the third element, the defendant must show that the error "affected the outcome of the lower court proceedings." *Id*.

Defendant properly preserved his claim of ineffective assistance of counsel by filing a motion for new trial and evidentiary hearing. *People v Head*, 323 Mich App 526, 538-539; 917 NW2d 752 (2018). A *Ginther* hearing was conducted by the trial court. Whether counsel was ineffective presents a mixed question of fact and constitutional law, and factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

During closing argument, the prosecutor made the following statement:

Ladies and gentleman [sic], I think that the evidence supports first degree murder, but I would say this: Let's say you believed the Defendant's stories, whichever one you want to choose, there were so many of them. Let's say you believed him that . . . [Jones] pulled out a gun, and he goes after the gun, and then they struggle, and it goes off, ladies and gentleman [sic], knowingly creat[ing] a very high risk of death or great bodily harm, knowing that that would be the likely result. You have that right there based on his statements. Right? She is not coming after him. Right? She just pulled the gun out, probably because she doesn't want him to leave, and so she knows without the gun he won't leave the house. Right? She's not threatening him.

He goes after her with a loaded weapon, one that he usually carries, and would know to be loaded, and then they struggle over it and it goes off, knowingly creating a high risk of death or great bodily harm, and knowing that to be the likely outcome, so even if you just believe what he said you have a second degree murder.

While instructing the jury on the elements of the crime of second-degree murder, the court indicated that the prosecutor had to prove beyond a reasonable doubt that defendant had one of three states of mind—an intent to kill, an intent to do great bodily harm, or that defendant "knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions." The trial court also informed the jurors that it was the court's duty to instruct them on the law, that they had to take the law as given to them by the court, and that "[i]f a lawyer says something different about the law, follow what I say."

At the *Ginther* hearing, attorney Paul Toman testified that he did not object to the prosecutor's statements because he thought that the remarks were "an accurate presentation of the facts and the law as I understood." Attorney Jeffrey Kaplan testified that he did not object because he felt that there were "better ways of attacking that in our closing." The trial court ruled that there was no basis for reversal, reasoning:

> There is nothing in that instruction that requires or suggests how that very high risk must be created. To do so would be impossible . . . . Remember also, the Defendant did not claim self-defense, nor did he request that the jury be instructed on self-defense. The defense's theory of the case never wavered . . . from beginning to end, that is that the death of Uniqua Jones was the result of a tragic accident.

> When the prosecutor's argument is considered in light of all of these circumstances, this Court cannot find that it was a misstatement of the law.

The trial court additionally noted that the jury had been instructed that the court, and not the lawyers, inform the jurors of the law. Finally, the trial court found that even if the prosecutor made a misstatement of law and counsel was ineffective for failing to object, defendant could not show prejudice, because there was "no sufficient showing here that the outcome of the trial would have been different."

Defendant claims that the prosecutor misstated the law by arguing that defendant's version of events, in which he argued that the shooting was purely accidental, amounted to second-degree murder. "A prosecutor's clear misstatement of the law that remains uncorrected may deprive a defendant of a fair trial." *People v Grayer*, 252 Mich App 349, 357; 651 NW2d 818 (2002). If, however, the jury is correctly instructed on the law, a prosecutor's erroneous legal argument can potentially be cured. *Id*. "The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022) (quotation marks and citations omitted). Malice can be established "by showing (1) the intent to kill, (2) the intent to cause great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. In this case, the prosecutor indicated that second-degree murder can be proven through evidence that a defendant knowingly created a high risk of death or great bodily harm. This statement was consistent with one of the ways that a prosecutor can demonstrate the requisite malice for purposes of second-degree murder. Thus, defendant's argument lacks merit.

Even if the prosecutor had erred in explaining the elements of second-degree murder, the trial court properly instructed the jury on the elements of the crime and told the jurors that the court, and not the lawyers, supply them with the law to be followed. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Ultimately, defendant has failed to show plain error.

As to the associated claim of ineffective assistance of counsel, defendant was required to establish that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome

-4-

would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Generally, defense counsel will not be considered ineffective for failing to raise a futile or meritless objection. See *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015). Since defendant failed to show prosecutorial error, he likewise cannot show that trial counsel was ineffective for failing to object.

## B. COVID-19 COURTROOM CLOSURE

Defendant next argues that the trial court erred by closing the courtroom to the public during trial and instead livestreaming the proceedings via Zoom. He alternatively argues that his defense counsel was ineffective for failing to object to the courtroom closure. We disagree.

This issue is unpreserved, given defense counsel's failure to object to the courtroom closure. *People v Vaughn*, 491 Mich 642, 666; 821 NW2d 288 (2012). Generally, we review unpreserved arguments, including unpreserved claims of structural error, for plain error affecting substantial rights. *Id*. at 666-667. Whether counsel was ineffective presents a mixed question of fact and constitutional law. *LeBlanc*, 465 Mich at 579. Factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *Id*.

When defendant's trial took place in April 2021, COVID-19 Administrative Orders Nos. 2020-6, 2020-14, and 2020-19 were in effect. AO 2020-6 "authorize[d] judicial officers to conduct proceedings remotely . . . using two-way interactive videoconferencing technology or other remote participation tools[,]" provided that doing so was not inconsistent with a party's constitutional rights, and provided that the court ensured the recording was made available to the public. AO 2020-14 provided for:

> • Continued use and expansion of remote hearings as practicable and increase of the court's capacity to conduct business online, including increased remote work by employees.

> • Continued limited access to courtrooms and other spaces to no more than 10 persons, including staff.

> • Imposition of social distancing practices of at least 6 feet for both employees and visitors.

> • Limited in-person court activity to essential functions that cannot be conducted remotely.

Under AO 2020-19, the Michigan Supreme Court ordered Michigan courts to "continue to expand the use of remote participation technology (video or telephone) as much as possible to reduce any backlog and to dispose of new cases efficiently and safely."[4] When defendant's trial was held, the

---

[4] Our Supreme Court recently addressed the constitutionality of its COVID orders AO 2020-3 and AO 2020-18. The Court determined that those orders were a proper exercise of its reserved powers under Const 1963, art 6, § 5. *Carter v DTN Mgt Co*, ___ Mich ___; ___ NW 3d ___ (2024) (Docket

Berrien County courts were also operating under Berrien County Trial Court Administrative Order 2021-02. Under that order, in-person court proceedings were permitted, but "[o]nly parties to a case or those under subpoena . . . [were] allowed" in the courtroom.

No issues arose with the use of Zoom until the fourth day of trial, when trial had to be paused for about 30 minutes due to a brief streaming error. Before the jury returned to the courtroom, the trial court asked if the parties had "any objections to the manner that the Court's handled this public trial?" Defense counsel responded in the negative. In defendant's motion for a new trial, he argued that defense counsel was ineffective for allowing a violation of defendant's constitutional right to a public trial by not objecting to the courtroom closure. Defendant contended that (1) the closure was not narrowly tailored because no members of the public could enter the courtroom; (2) defense counsel failed to ask the court to consider reasonable alternatives, such as alternate seating or social distancing; (3) defense counsel failed to ask the court to place its findings on the record; and (4) he was prejudiced by the closure because it rendered his trial "fundamentally unfair."

At the *Ginther* hearing, attorney Toman testified that he recalled a discussion with the trial court regarding the livestreaming of the trial, but did not recall any "explicit agreement" with the court about the closure. Toman explained, "I thought, given the mandates that we were operating under due to COVID, I didn't think that was a constitutional issue because we had the li[v]e feed." Toman conceded that he was not familiar with the requirements to close a courtroom stated by the United States Supreme Court in *Waller v Georgia*, 467 US 39; 104 S Ct 2210; 81 L Ed 2d 31 (1984). The trial court rejected defendant's arguments, essentially ruling that the court complied with the Supreme Court's COVID-19 administrative orders and that the State Court Administrator's Office approved the use of livestreaming for purposes of criminal trials, which protected defendant's constitutional right to a public trial.

In *Waller*, 467 US at 44-45, the United States Supreme Court addressed a defendant's constitutional right to a public trial under US Const, Am VI:

> [T]he Court has made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such

---

No. 165425). It reasoned that the orders were also "valid exercises of our reserved power to exert 'superintending control over all courts[.]' " *Id*. at ___; slip op at 22, quoting Const 1963, art 6, § 4. The Court continued:

> Although the exact boundaries of our power of superintending control as it relates to practice and procedure have not yet been defined, we have previously established that exercising this power is permissible during exigent circumstances. We have also noted that the power of superintending control is appropriate where necessary to insure the harmonious working of our judicial system. COVID-19 was an exigent circumstance requiring this Court's action to safeguard our courts, and so § 4 authorized our exercise of this power in adopting the administrative orders. [*Id*. (quotation marks and citations omitted).]

-6-

circumstances will be rare, however, and the balance of interests must be struck with special care . . . .

The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered. [Quotation marks and citations omitted.]

"Both the United States Constitution and the Michigan Constitution guarantee a criminal defendant the right to a public trial." *People v Davis*, 509 Mich 52, 66; 983 NW2d 325 (2022). The public-trial requirement is for the accused's benefit, allowing the public to see that he or she has received fair treatment and has not been unjustly condemned. *Id*. "The public-trial right also helps ensure that judges and prosecutors fulfill their duties ethically, encourages witnesses to come forward, and discourages perjury." *Id*. However, "the public-trial right is not unlimited, and circumstances may exist that warrant the closure of a courtroom during any stage of a criminal proceeding." *Id*. To justify closing the courtroom, "there must be an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id*. (quotation marks and citation omitted).

With respect to defendant's argument that the trial court failed to identify an overriding interest for closing the courtroom and did not put any findings on the record, the articulation requirement was effectively satisfied by our Supreme Court for the benefit of all Michigan trial courts through its COVID-related administrative orders. In the introduction to AO 2020-6, the Supreme Court articulated:

In response to the extraordinary and unprecedented events surrounding the COVID-19 pandemic in Michigan, the Court has adopted a number of administrative orders authorizing courts to implement emergency measures to mitigate the transmission of the virus and provide the greatest protection possible to those who work and have business in our courts . . . .

Although our highest priority during this crisis is for courts to continue to be vigilant and protect against further spread of the coronavirus, we must also continue to ensure that our courts operate as efficiently and effectively as possible under the circumstances, continue to ensure timely hearing and disposition of essential matters, and make our best efforts to provide timely justice in all other matters. The purpose of the order is to empower our courts and judges to meet this challenge by allowing them to use innovative ways to conduct court business remotely, including best practices as identified by the State Court Administrative Office.

Thus, it is clear that there existed a compelling or overriding interest in protecting the public from the spread of COVID-19.

Whether the closure was broader than necessary to protect that overriding interest is a more difficult question. As part of that analysis, consideration must be given to "reasonable alternatives to closing the proceeding[.]" *Davis*, 509 Mich at 66-67. Here, the trial court closed the courtroom to public viewers without attempting to allow anyone in the courtroom, perhaps by using social distancing measures, as defendant suggests. However, even social distancing may not have been enough to ensure that COVID-19 did not spread. On that matter, we find persuasive *People v Zemek*, 93 Cal App 5th 313, 331; 310 Cal Rptr 3d 812 (2023),[5] where it was stated that:

> [W]e think it unfair, from our pristine perch in May 2023, to declare that the trial court did not narrowly tailor its order to address the crisis because it simply did not allow [the defendant]'s spouse and sister to sit in the back of the courtroom during the trial. We reach this conclusion despite acknowledging that in late 2020 one of the recognized tools to reduce exposure was to physically distance people six feet apart. Although social distancing could lessen possible virus exposure, it was no guarantee. In the face of the increasing threat of COVID-19, we cannot fault the trial court here for limiting the individuals physically in the courtroom to those necessary for the trial: the parties, attorneys, courtroom personnel, jurors, and testifying witnesses. Nor will we say the order closing the courtroom to the public was not narrowly tailored to achieve a compelling interest. Each additional person permitted inside the courtroom (a confined space) is an additional person who may have COVID-19 and increases the risk of infection to courtroom staff, jurors, and trial participants. In short, the restriction on public access to the courtroom was essential to a higher value, protecting the health and immediate safety of litigants, trial participants, and court employees from exposure to people who may be contagious for COVID-19 and limiting the spread of COVID-19 to the broader public. Moreover, the exclusion of the public was narrowly tailored and not broader than necessary to protect the public health. And the fact the trial was available to the public via livestream helped to further assure the integrity of the judicial process. [Citation omitted.]

Likewise, in *United States v Allen*, 34 F4th 789, 792-793 (CA 9, 2022), the United States Court of Appeals for the Ninth Circuit found a violation of the defendant's constitutional right to a public trial when the trial court closed the courtroom and allowed an audio feed but did not employ livestreaming.[6] The Ninth Circuit observed:

> In determining whether the district court erred in not adopting less restrictive alternatives here, we begin by considering the policies adopted by other jurisdictions to address COVID issues. In this context, we consider video streaming

---

[5] Cases from other states are not binding on this Court, but may be considered persuasive. *People v Spaulding*, 332 Mich App 638, 648 n 2; 957 NW2d 843 (2020).

[6] "Although state courts are bound by United States Supreme Court decisions construing federal law, they are not similarly bound by the decisions of the lower federal courts[.]" *People v Gillam*, 479 Mich 253, 261; 734 NW2d 585 (2007) (citations omitted). This Court is instead "free to follow or reject the[] authority" of the lower federal courts. *Id*.

to be a less restrictive alternative to audio streaming, because the core of the defendant's Sixth Amendment right is to have his trial open for public attendance and observation.

Our review of other jurisdictions reveals that the district court's order was "truly exceptional." During the pandemic, federal trial courts throughout the country addressed the same issue as the district court here. These courts (including courts that held trials in late 2020, when the district court held Allen's trial) consistently allowed some form of visual access to the trial, either by allowing the public to view a live video feed of the trial in a separate room in the courthouse, or by allowing a limited number of spectators to be present in the courtroom. [*Id.* at 798 (citations omitted).]

We find these rationales persuasive, and ultimately conclude that livestreaming was a reasonable, narrowly tailored alternative to safeguard the integrity of the judicial process and to secure the protections afforded by the constitutional right to a public trial.

We likewise find that defendant cannot establish the factual predicate for his related claim of ineffective assistance of counsel. Had counsel objected here, they would have been placed in the indefensible position of asking the trial court to disobey Supreme Court and local administrative orders pertaining to COVID-19. Moreover, defendant has not established a violation of his constitutional right to a public trial. "[C]ounsel is not ineffective for failing to raise meritless or futile objections." *Putman*, 309 Mich App at 245. Even assuming deficient performance by defense counsel, defendant cannot show that he was prejudiced. It is highly unlikely that the courtroom closure had any bearing on the jury's decision to find him guilty of Jones's murder. Had defense counsel successfully objected, and had the courtroom been reopened, defendant would still have been convicted. Accordingly, defendant's claim must fail.

## C. SENTENCING

Defendant next argues that the trial court abused its discretion by imposing a sentence of 50 to 87 ½ years' imprisonment for second-degree murder. We disagree.

"[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is an abuse of discretion." *People v Dixon-Bey*, 321 Mich App 490, 520; 909 NW2d 458 (2017) (alteration in original; quotation marks and citation omitted). This applies equally to within-guidelines sentences and departure sentences. *People v Posey*, 512 Mich 317, 352; 1 NW3d 101 (2023) (*Posey II*). "[T]he relevant question for appellate courts reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality[.]" *Dixon-Bey*, 321 Mich App at 520 (quotation marks and citation omitted). "A trial court abuses its discretion if the imposed sentence is not 'proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Ventour*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 363922); slip op at 7, quoting *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). Further, "a trial court necessarily abuses its discretion when it makes an error of law." *People v Hawkins*, 340 Mich App 155, 173; 985 NW2d 853 (2022).

Defendant was sentenced within the guidelines in this case. "When a trial court sentences a defendant within the guidelines' recommended range, it creates a presumption that the sentence is proportionate." *Posey II*, 512 Mich at 360. To overcome this presumption, "the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate[.]" *Id.* at 359. At sentencing, the trial court simply stated:

> The jury has found you guilty of murder, Mr. Perry, and has given me—the statute and legislature has given me discretion to sentence you within a period of years . . . . I'm not showing you leniency in any manner, way, or form. You took the life of a person that loved you, and I'm going to follow the recommendation of the People.

The trial court did not provide further explanation for the sentence, essentially relying on the legislative sentencing guidelines. However, "there is nothing in *Posey* [*II*] suggesting that a sentencing court needs to expressly explain why a within-guidelines sentence is reasonable and proportionate." *People v Posey*, ___ Mich App ___; ___ NW3d ___ (2023) (Docket No. 345491) (*Posey III*); slip op at 4. Additionally, this Court has explained that "[t]he articulation requirement is satisfied if the trial court expressly relies on the sentencing guidelines in imposing the sentence or if it is clear from the context of the remarks preceding the sentence that the trial court relied on the sentencing guidelines." *People v Conley*, 270 Mich App 301, 312-313; 715 NW2d 377 (2006) (quotation marks and citations omitted). Here, the trial court plainly relied on the sentencing guidelines. We therefore find no error in the court's sentencing decision.

## D. EXPERT WITNESS TESTIMONY

Defendant next argues that the trial court abused its discretion by excluding expert testimony on Jones's ability to safely handle firearms. We disagree.

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). A trial court necessarily abuses its discretion when it makes an error of law. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). "When the decision regarding the admission of evidence involves a preliminary question of law, such as whether a statute or rule of evidence precludes admissibility of the evidence, the issue is reviewed de novo." *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003).

Expert testimony is governed by MRE 702.[7] At the time of trial, MRE 702 provided:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product

---

[7] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of MRE 702 that was in effect at the time of trial.

of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

At trial, defendant sought to introduce photographs of Jones handling guns. The prosecutor argued that the photos were irrelevant because the guns in the photos were not involved in the shooting. She further claimed that defendant was attempting to improperly show Jones's bad character. Defendant responded that the photos were relevant because defendant's expert could testify that Jones was "holding the gun in an unsafe manner[.]" The trial court opined that Jones's alleged "habit" or character of handling guns unsafely could not be argued by defendant. See MRE 406. The trial court asked defense counsel whether his expert could testify that the guns were being handled improperly even if they were not loaded. Counsel claimed that it did not matter because "whether the gun is known to be loaded or not, you don't point guns at people." The prosecution reiterated her assertion that the photos were irrelevant, and added that any probative value was substantially outweighed by the danger of unfair prejudice under MRE 403.

Defendant sought to admit seven photos, but has only included three of those photos in the record on appeal. Defendant does not identify the content of the four remaining photos, nor are any of the photos contained in the lower court record. It appears that the trial court denied the admission of a photograph showing Jones holding a gun with what looks like a marijuana cigarette in her mouth, because it constituted "inappropriate character evidence and would just end up confusing the jury to the character of the decedent." The court also denied admission of a photo that appears to show a gun tucked into the waistband of Jones's pants, stating: "If that's a real gun and not—I don't know if that's not some sort of picture insert. I don't know that you could prove that in any manner."

The court, however, did admit (1) a photograph showing Jones holding a gun with her finger on the trigger and possibly the slide pulled back, and (2) a photograph showing Jones pointing the barrel of the gun directly at the camera. The court explained:

> I don't know how you're going to prove that that's an unsafe way to handle a gun, being that you don't know who took that picture, you don't know that that gun is unloaded, you don't know if there's anybody on the other side. So you can admit the evidence to show that she has handled guns, and handled these guns.
>
> Th[ere] is not going to be an argument that she handles them in an unsafe manor [sic]. The jury can make the determination by themselves, to themselves, but you don't have any way of arguing or proving that these guns are, in fact, unsafe, or loaded, or . . . that your expert can do so either.

Despite the trial court's ruling, defense counsel asked whether he was "going to be allowed to present these [two photos] to my expert to testify that it would be unsafe for [Jones] to hold the gun this way, with her finger on the trigger and the slide pulled back?" The court indicated its belief that the gun in the photos was not loaded and that the magazine was empty. It also questioned whether the photos were relevant simply because Jones may have at one time handled a gun unsafely, especially when the court was not going to allow "habit" evidence. Ultimately, the trial court stuck to its ruling, allowing the two photos to be admitted for a limited purpose.

Steven Howard was called by the defense and qualified as an expert in firearms, trigger pulls, and gun safety. Howard testified that a gun should not be loaded "until just before you're ready to shoot it[,]" that one should not place a finger on the trigger until the last possible moment before shooting, that magazines should not be loaded into firearms until ready for use, and that a gun should be treated "as if it is loaded at all times." Although Howard did not provide this gun-safety testimony in direct reference to the photos of Jones handling guns, the jury was ultimately presented with photos of Jones handling guns and expert testimony about unsafe gun practices that effectively encompassed the actions seen in the photos. The jury was certainly capable of connecting the dots between the photos and Howard's testimony. We thus conclude that defendant cannot establish prejudice. Indeed, even absent Howard's testimony, the jurors may have concluded on their own that Jones was not safely handling the guns.

Moreover, as the trial court recognized, there were unknown elements about Jones's handling of the guns in the photos, and even if she was handling them in an unsafe manner at the time, it would not necessarily mean that she did so when the shooting occurred. Defendant does not make a "habit" argument under MRE 406. Additionally, defendant's own descriptions of what transpired, i.e., that he grabbed Jones's wrists and the two tussled when the gun discharged, have no factual correlation whatsoever to the circumstances depicted in the photographs. Thus, their relevance was simply not established. See MRE 401. Howard's prospective opinion testimony would not have assisted the jurors' understanding of the evidence or their determination of a fact in issue, nor would his expert opinion have been based on sufficient facts or data given the photographic unknowns. See MRE 702. The trial court thus did not abuse its discretion by declining to allow Howard to testify that Jones was unsafely handling the guns seen in the photographs.

## E. DOUBLE JEOPARDY

Defendant next argues that his constitutional protection against double jeopardy was violated. We hold that it was not.

"A double-jeopardy challenge presents a question of constitutional law that this Court reviews de novo." *People v Ream*, 481 Mich 223, 226; 750 NW2d 536 (2008).

At the beginning of defendant's first trial, he pleaded guilty as a fourth-offense habitual offender to the offenses of felony-firearm and felon-in-possession, with felon-in-possession serving as the predicate felony for purposes of felony-firearm. In taking the plea, the trial court explained that in light of defendant's decision to plead guilty to the two firearm offenses, the prosecution would not mention his prior convictions to the jury. On the second day of the first trial, an officer testified that he came into contact with defendant as a result of a parole violation. Defendant moved for a mistrial. The trial court found that although the prosecutor's question called for a narrative, the officer's statement about parole was unsolicited. The trial court further stated that the officer's testimony was "a relatively unresponsive answer," that the prosecutor did not "solicit the parole answer in any manner," and that this was not a situation that called for a dismissal with prejudice.

The court also noted that defendant had tried to keep the jurors from learning about his criminal record by pleading guilty to felony-firearm and felon-in-possession. It reasoned that the

jury likely drew the conclusion that defendant had a criminal record when it heard the officer mention that defendant was on parole. The court also believed that any kind of limiting or cautionary instruction would draw more attention to the matter. On the basis of its own determinations and a finding of manifest necessity, the court granted defendant's motion for mistrial. Defense counsel then chimed in:

> As far as the standard for the mistrial and double jeopardy attaching . . . I do just want to note that preparing the witness is the responsibility of the prosecution . . . . it may not be malicious, we would still argue that it is negligent conduct on the part of the prosecutor not to have her witness properly prepared[.]

The trial court did not find that the prosecutor's questioning amounted to maliciousness, negligence, or intentional misconduct, but declared a mistrial because of manifest necessity.

Under the Michigan and federal constitutions, the state cannot twice place an accused in jeopardy for the same criminal offense. See US Const, Am V; Const 1963, art 1, § 15; *People v Beck*, 510 Mich 1, 11-12; 987 NW2d 1 (2022). The double-jeopardy prohibition secured by the Fifth Amendment constitutes a fundamental constitutional right applicable to the states through the Fourteenth Amendment. *Id*. at 11 n 1. Although we need not construe our Constitution consistently with comparable provisions of the United States Constitution, past interpretations of the Fifth Amendment's Double Jeopardy Clause have accurately conveyed the meaning of Const 1963, art 1, § 15. *Beck*, 510 Mich at 11 n 1. "Therefore, our analysis is the same under each." *Id*.

The protection against double jeopardy attaches when a defendant is placed on trial before a jury or a judge. *Id*. at 12. When a trial concludes prematurely, retrial for the same offense is prohibited unless the defendant consented to the interruption or a mistrial was declared on the basis of a manifest necessity. *Id*. at 12. When "the trial ends before a verdict—where a mistrial is declared—the Double Jeopardy Clause *may* bar a retrial." *People v Dawson*, 431 Mich 234, 251; 427 NW2d 886 (1988) (emphasis added). In *Dawson*, *id*. at 253, our Supreme Court observed:

> Where [a] motion for mistrial was made by defense counsel, or with his consent, and the mistrial was caused by innocent conduct of the prosecutor or judge, or by factors beyond their control, or by defense counsel himself, retrial is also generally allowed, on the premise that by making or consenting to the motion the defendant waives a double jeopardy claim.
>
> Where a defendant's motion for mistrial is prompted by intentional prosecutorial conduct, however, the defendant may not, by moving for a mistrial, have waived double jeopardy protection. The United States Supreme Court has held that the Double Jeopardy Clause bars retrial where prosecutorial conduct was intended to provoke the defendant into moving for a mistrial. *Oregon v Kennedy*, 456 US 667; 102 S Ct 2083; 72 L Ed 2d 416 (1982). [Citation omitted.]

There is no indication that the prosecutor intended to provoke a mistrial in this case. Trial had barely started, and there is nothing in the record to suggest that the prosecution's case had gone bad or was falling apart, such that the prosecutor would have been motivated to goad defendant into moving for a mistrial. The prosecutor's question to the officer was open-ended. She did not

ask a question that would have necessarily required the officer to discuss defendant's parole status. That he did so was purely because the question offered room for a narrative response. The trial court concluded that there was no prosecutorial misconduct. Thus, we conclude that the protection against double jeopardy did not attach.

Defendant argues that this Court should construe the Michigan Constitution's Double Jeopardy Clause more broadly than the federal provision and apply the standard set forth by the Arizona Supreme Court in *Pool v Superior Court*, 139 Ariz 98; 677 P2d 261 (1984). Our Supreme Court in *Dawson*, 431 Mich at 256-257, found it unnecessary to decide whether *Pool* should be adopted because the prosecution conceded misconduct under *Kennedy*. Under *Pool*, the analysis requires determining whether the prosecutor engaged in conduct knowing it to be improper and doing so with indifference, if not a specific intent, thereby creating unfair prejudice. *Id*.[8] However, the prosecutor in no way conveyed that she knew her conduct was improper when speaking about it to the judge. This Court remains bound by *Dawson* and *Kennedy*, but even under *Pool*, a prosecutor's negligent conduct, standing alone, does not suffice to bar retrial.[9]

## F. JURY SELECTION

Defendant finally argues that the trial court improperly dismissed prospective jurors because of their past misdemeanor charges or convictions. We disagree.

"For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court." *Metamora Water Serv, Inc*, 276 Mich App at 382. Defendant objected to the for-cause dismissal of two prospective jurors, contending that they had been subjected to voir dire and had not expressed any bias or prejudice against the prosecutor's office or the criminal justice

---

[8] In *Pool*, 139 Ariz at 108-109, the Arizona Supreme Court specifically ruled:

> We hold, therefore, that jeopardy attaches under art 2, § 10 of the Arizona Constitution when a mistrial is granted on motion of defendant or declared by the court under the following conditions:
>
> 1. Mistrial is granted because of improper conduct or actions by the prosecutor; and
>
> 2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and
>
> 3. the conduct causes prejudice to the defendant which cannot be cured by means short of a mistrial.

[9] We note that the Michigan Supreme Court is poised to address whether the principles in *Pool* and similar cases from other states should be adopted. See *People v Jennings*, 513 Mich 977; 998 NW2d 897 (2024). However, unless and until our Supreme Court decides otherwise, *Dawson* and *Kennedy* remain the law of the land.

-14-

system. "We review for abuse of discretion a trial court's rulings on challenges for cause based on bias." *People v Williams*, 241 Mich App 519, 521; 616 NW2d 710 (2000). However, defendant's additional court-rule, statutory, and constitutional arguments were not properly preserved, and are thus reviewed for plain error affecting his substantial rights. *Thomas*, 260 Mich App at 453-454.

To the extent that this claim concerns the proper interpretation of a court rule, this Court construes court rules using the same principles that apply to the interpretation of statutory provisions. *In re Mota*, 334 Mich App 300, 311; 964 NW2d 881 (2020). "Court rules should be interpreted to effect the intent of the drafter, the Michigan Supreme Court." *Id.* (quotation marks and citation omitted). Language contained in a court rule that is clear and unambiguous "must be given its plain meaning and is enforced as written." *Id.*

During voir dire, the prosecution challenged for cause a prospective juror in Seat 10 on the basis of their "convictions for NSF checks" in Berrien County in 1988. The prosecutor also challenged for cause a prospective juror in Seat 9 on the basis of their "contact with the criminal justice system" in Berrien County in 1996 and 2013 in relation to domestic violence, and again in 2018 in relation to "no operator's license on person[.]" Defense counsel objected to these challenges, arguing that both prospective jurors had been subjected to voir dire and had not expressed bias against the prosecutor's office or the criminal justice system in general. The trial court granted the challenges only because the court rules mandated that it do so. Later, the trial court noted that a bench conference took place because the prosecutor "had an issue" with the prospective juror in Seat 7 on the basis of a 1996 conviction that led to "a 7411 dismissal."[10] The prosecutor, however, indicated that she did not wish to exercise a challenge.

Under MCR 2.511(E)(10), "[i]t is grounds for a challenge for cause that the person . . . is or has been a party adverse to the challenging party or attorney in a civil action, *or has complained of or has been accused by that party in a criminal prosecution*[.]" (Emphasis added.) This language was construed in *People v Eccles*, 260 Mich App 379; 677 NW2d 76 (2004). At the time of trial, an identical provision was found in MCR 2.511(D)(10). The identical provision was found in MCR 2.511(D)(11) when *Eccles* was decided.[11] In *Eccles*, 260 Mich App at 380-381, this Court stated that "once a party shows that a prospective juror falls within the parameters of one of the grounds enumerated in MCR 2.511(D), the trial court is without discretion to retain that juror, who must be excused for cause." *Eccles*, 260 Mich App at 383.

The *Eccles* Court also addressed the defendant's argument "that the trial court's 'hard and fast policy' of granting the prosecutor's challenges under MCR 2.511(D)(11), despite the potential jurors having indicated their ability to be fair and impartial, resulted in a 'systematic exclusion' of African-Americans from the jury panel." *Id.* at 384. This Court indicated that "[t]he right to a fair trial under the Sixth Amendment of the federal constitution requires that juries be drawn from a fair cross-section of the community," and that "[f]or this reason, distinct groups represented in the

---

[10] This apparently was a reference to MCL 333.7411, which addresses the deferral of criminal proceedings for certain drug offenses.

[11] We shall refer to MCR 2.511(D)(10), except when directly citing or quoting *Eccles*.

-15-

community may not be systematically excluded from the jury selection process." *Id*. at 385. The *Eccles* Court then ruled:

> Initially, we note that it is not disputed that the prospective jurors at issue here had each been the subject of misdemeanor criminal prosecutions, a fact that . . . constitutes a proper ground for a prosecutorial challenge for cause under MCR 2.511(D)(11). A proper ground for a challenge for cause having been shown, the trial court was without discretion to retain these individuals regardless of whether they asserted an ability to be fair and impartial. Thus, the trial court's excusing them in compliance with the rule, having not been presented with the Sixth Amendment argument defendant now raises on appeal, was not plain error.
>
> Moreover, the record in this case is devoid of any evidence from which it can be concluded that the prospective jurors excused under MCR 2.511(D)(11) were in fact African-American . . . . Consequently, there being no evidence from which to conclude that application of MCR 2.511(D)(11) resulted in the exclusion of any African-Americans from the jury that decided his case, defendant has failed to establish plain error affecting his substantial rights. [*Id*. at 385-386 (citations omitted).]

*Eccles* is binding precedent that we must follow. See MCR 7.215(J)(1). Moreover, the plain and unambiguous language of MCR 2.511(D)(10) fully supports the construction enunciated in *Eccles*.

Defendant nevertheless argues that there is no evidence that our Supreme Court, in adopting MCR 2.511(D)(10), sought to contravene the Legislature's choice, set forth in MCL 600.1307a, to allow an otherwise unbiased person accused of a misdemeanor to serve on a jury. MCL 600.1307a provides, in relevant part:

> (1) To qualify as a juror, an individual must meet all of the following criteria:
>
> (a) Be a citizen of the United States, 18 years of age or older, and a resident in the county for which the individual is selected, and in the case of a district court in districts of the second and third class, be a resident of the district.
>
> (b) Be able to communicate in the English language.
>
> (c) Be physically and mentally able to carry out the functions of a juror. Temporary inability must not be considered a disqualification.
>
> (d) Not have served as a petit or grand juror in a court of record during the preceding 12 months.
>
> (e) Not have been convicted of a felony.

We find defendant's argument unpersuasive. There is simply no conflict between the *Eccles* construction of MCR 2.511(D)(10) and MCL 600.1307a(1). MCL 600.1307a(1) provides inflexible requirements for an individual to be considered for jury duty. The grounds listed in MCR 2.511(D) do not prevent persons meeting the criteria from sitting as jurors when there is no challenge for cause, as occurred in this case with regard to one prospective juror. Moreover, MCL 600.1307a(1) cannot be construed to mean that any and all persons who satisfy the basic requirements and qualifications to sit as jurors, including individuals convicted of misdemeanors and not felonies, can in fact sit as jurors.[12] Instead, MCL 600.1307a(1) and MCR 2.511(D)(10) operate harmoniously. A prospective juror must first meet the qualifications set out in MCL 600.1307a(1) to sit as a juror, and then the analysis shifts to MCR 2.511(D)(10) to determine whether he or she is subject to a challenge for cause. Any suggestion that the Legislature, in crafting MCL 600.1307a(1), intended solely for prospective jurors to be dismissed on challenges for cause when actual bias is demonstrated is therefore misplaced.

Defendant also argues that the *Eccles* decision effectively gave MCR 2.511(D)(10) a substantive application with respect to juror qualifications, which conflicted with MCL 600.1307a(1), and that such a construction violates the separation of powers. Defendant is essentially contending that construing MCR 2.511(D)(10) to bar prospective jurors from sitting on a jury because of a past misdemeanor charge or conviction is the equivalent of establishing juror qualifications, which is a matter of substantive law and not practice and procedure. Therefore, says defendant, the judiciary encroached on the powers of the legislative branch by adopting MCR 2.511(D)(10).

"The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2. The Supreme Court has the authority to "establish, modify, amend and simplify the practice and procedure in all courts of this state." Const 1963, art 6, § 5. In accordance with the separation-of-powers principles, the Supreme Court's authority in matters of practice and procedure is exclusive and cannot be exercised by the Legislature. *People v Watkins*, 491 Mich 450, 472-473; 818 NW2d 296 (2012). The Supreme Court's rulemaking authority is limited to matters of practice and procedure. *Id*. at 473. Therefore, the Supreme Court is not authorized to establish, abrogate, or modify the substantive law. *McDougall v Schanz*, 461 Mich 15, 27; 597 NW2d 148 (1999). When a rule and a statute conflict, a court must ascertain whether the statute or rule addresses purely procedural matters or substantive law. See *id*.

As discussed *supra*, there is no conflict between MCR 2.511(D)(10) and MCL 600.1307a(1). Furthermore, defendant appears to take no issue with our Supreme Court adopting a court rule that authorizes dismissing a prospective juror for cause on the basis of actual

---

[12] Aside from the fact that a prospective juror who was previously charged with, or convicted of, a misdemeanor may still end up sitting as a juror absent a challenge for cause, if that juror was previously charged with or convicted of the misdemeanor anywhere in the state outside of the prosecutor's office that is handling the criminal trial, MCR 2.511(D)(10) would not be implicated, whereas the "felony" provision in the statute has no such limitation.

bias, but opposes the Supreme Court's adoption of a court rule authorizing the dismissal of a juror for cause on the basis of bias that is implied from certain circumstances. There is no logic to concluding that the latter constitutes a violation of separation-of-powers principles and that the former does not. And again, MCL 600.1307a(1) has nothing to do with bias. The Legislature was silent on the issue of bias; it was concerned with preventing, for example, minors and noncitizens from serving on juries. Under defendant's reasoning, the Supreme Court would not have the authority to adopt a court rule authorizing the dismissal of a prospective juror on the basis of actual bias because doing so would encroach on legislative powers to set juror qualifications. Yet that is exactly how defendant wishes this Court to rule in the instant case, i.e., to construe MCR 2.511(D)(10) as requiring a showing that a prospective juror is actually biased because of a past criminal charge or conviction. Rules regarding challenges for cause in a jury trial seem to be the epitome of practice and procedure.

Defendant next argues that MCR 2.511(D)(10), as construed by *Eccles*, grants arbitrary power to prosecutors and potentially allows surreptitious juror strikes on the basis of race, undermining our public jury system. The gist of defendant's stance is that, even though a challenge for cause must be granted under MCR 2.511(D)(10) if the prospective juror was previously charged or convicted by the prosecutor's office in the county at issue, the prosecutor is free to make or pass on the challenge. And with this unfettered discretion by the prosecutor, a serious risk of discrimination exists. Defendant fails to cite any pertinent legal authority to support his argument, and thus it has been waived. See *People v Kammeraad*, 307 Mich App 98, 143; 858 NW2d 490 (2014) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." (quotation marks and citation omitted).] With respect to the portion of defendant's argument pertaining to the prosecutor's discretion, all challenges for cause on whatever grounds in MCR 2.511(D)(10) necessarily implicate discretionary decision-making, whether by a prosecutor or a defense attorney in a criminal case, but this cannot serve as a basis to construe the language of a court rule contrary to its plain and unambiguous language. Peremptory challenges provide even greater discretion and latitude.

With respect to the discriminatory component of defendant's argument, we note that he mentions *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), which addressed the exercise of *peremptory* challenges for racially discriminatory reasons. But our case concerns challenges *for cause*. In *United States v Elliott*, 89 F3d 1360, 1364-1365 (CA 8, 1996), the United States Court of Appeals for the Eighth Circuit stated:

> *Batson* applies only to peremptory strikes. We know of no case that has extrapolated the *Batson* framework to for-cause strikes. There is simply no legal basis for this argument, which fails to recognize that peremptory strikes, for which no reasons need be given (absent a *Batson* challenge), are different from challenges for cause, which by definition require a showing of cause. [Quotation marks, citations, and alteration brackets omitted.]

In this case, assuming the accuracy of defendant's averments in his affidavit regarding racial makeups, which were less than definitive, there is little indication that the prosecutor acted with

any racial animus or discriminatory intent when raising the challenges for cause or declining to do so.

Finally, defendant maintains that the trial court denied him both due process and equal protection of the law by systematically and unconstitutionally excluding otherwise qualified persons from the jury. "The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial." *Rivera v Illinois*, 556 US 148, 158; 129 S Ct 1446; 173 L Ed 2d 320 (2009) (quotation marks and citation omitted). But if one accepts the premise that all prospective jurors—who are qualified to sit on a jury under MCL 600.1307a(1) and who indicate that they have no actual bias and can be impartial—cannot be excused without violating a defendant's due-process rights, then all peremptory challenges would be unconstitutional. Peremptory challenges, to an extent, are by their very nature arbitrary and subject to discretion. Granting challenges for cause under MCR 2.511(D)(10) on the basis of implied bias is a mechanism to secure the fairness and impartiality of trials and to protect the sanctity of jury verdicts from accusations of an *appearance of bias*. Fundamental fairness to the defendant is not infringed.

With respect to equal protection, defendant again cites to *Batson*. His discussion of *Batson* appears to be twofold. He argues that the prosecutor improperly used challenges for cause to dismiss black jurors, and also posits that there exists systemic discrimination because black people have been disproportionality subjected to criminal prosecutions, making it more likely that they will be dismissed for cause under MCR 2.511(D)(10). Citing a Michigan Department of State Police online report, defendant claims that "according to recent government data, despite accounting for less than 14% of Michigan's population, 37.5% of arrestees in 2021 in the state were Black." Defendant did not present this argument or information below; therefore, the issue is forfeited. Moreover, because MCR 2.511(D)(10) necessarily operates within a particular county and not statewide, Berrien County statistics would be the relevant data to consider in this case. Thus, the record is inadequate to allow us to properly analyze defendant's argument. We further note that in *Washington v Davis*, 426 US 229, 239; 96 S Ct 2040; 48 L Ed 2d 597 (1976), the United States Supreme Court explained:

> The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups. But our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact. [Citation omitted.]

In this case, there is no claim that our Supreme Court had a racially discriminatory purpose in adopting MCR 2.511(D)(10).[13] On this record and on the basis of applicable caselaw and legal

---

[13] To be sure, MCR 2.511(D)(10) makes little sense in certain contexts, as the court rule contains no time parameters and encompasses mere accusations in *any* criminal prosecution. Therefore,

principles, we conclude that defendant has failed to show that the trial court erred by dismissing jurors on the basis of their prior misdemeanor convictions.

Affirmed.

/s/ Michelle M. Rick
/s/ Kathleen Jansen
/s/ Anica Letica

---

for example, a prospective juror charged with a misdemeanor 30 years earlier would be subject to a challenge for cause, and the court would be mandated to grant the challenge. Perhaps it is time for our Supreme Court to revisit the court rule. However, unless the Court chooses to do so, we are bound to follow the rule as written.